Joseph CELESTINE, Plaintiff,

v.

LYKES BROTHERS STEAMSHIP CO., INC., and Does 1 through 30, Defendants.

No. C 88 4237 RHS.

United States District Court, N.D. California.

Aug. 21, 1989.

Steven J. Bell, Law Offices of Stanley J. Bell, San Francisco, Cal., for plaintiff.

Frederick W. Wentker, Jr., Oren P. Noah, Lillick & Charles, San Francisco, Cal., for defendants.

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

SCHNACKE, District Judge.

The motion for summary judgment of defendant Lykes Bros. Steamship Co., Inc. is hereby GRANTED.

### BACKGROUND

On January 15, 1987, Plaintiff, Joseph Celestine ("Celestine"), was working as a longshoreman for California Stevedore and Ballast Company ("CS & B") aboard defendant's ship LOUISE LYKES, which was berthed at the Oakland Army Terminal. Celestine began his shift at about 8:00 a.m. He and a partner, Clarence Van Dyke ("Van Dyke"), took turns driving the winch and tending the hatch to the number five hold. Every hour Celestine and Van Dyke passed by a spare coil of wire stored on the winch deck without incident. This coil of wire was to be used for lifting heavier than normal loads.

Celestine claims he tripped over the coil when he passed it at around 3:00 p.m. Thus, he had passed the coil many times without incident prior to the accident. Celestine claims that he never noticed the wire on the deck prior to his accident. (Celestine Depo. at 21:6—10.) The coil was lying in the open in broad daylight and there was nothing obstructing one from seeing it. (Van Dyke Depo. at 43:9—15; 61:3—4.) Van Dyke testified that he stepped onto the coil each time he stepped off the top rung of the ladder leading to the winch deck. (Id. at 41:20—23; 48:2—8; 51:16—20; 53:6 —14.) Van Dyke also testified that the coil's condition did not change during the day. (Id. at 39:12—14; 54:18—55:1.)

Hildebrand, the walking boss for CS & B during the relevant shift, testified that it was the duty of the winch drivers to inspect the winch decks for any safety hazards and to either correct them or to report them to their superiors for appropriate action. (Hildebrand Depo. at 14:8—18; 38:25 —39:19.) If, hypothetically, the coil of wire was so close to the head of the ladder to the winch deck as to require stepping onto the coil, failure to correct this condition would be a violation of the mandatory Occupational Safety and Health Administration regulations that require stevedoring companies to correct tripping or stumbling hazards. (Id. at 43:7—44:6.)

Any hazard presented by the coil of wire was easily correctable. Celestine testified that he merely replaced loose stands onto the coil after the accident. No significant extra time or effort was required to correct the open and obvious situation.

Captain Conti, the ship's master, testified that the coil was regularly stored on the winch deck so as to be readily accessible if it was needed. (Conti Depo. at 16:16— 17:17.) He also testified that no members of the ship's crew used the extra cable during this cargo operation. The LOUIS LYKES was under charter to the U.S. military and the cargo operations were under the control of the Military Sea Lift Command and the Oakland Army Terminal. (Id. at 37:23—38:12; 73:11—78:12; 83:11— 84:8.) The winch deck is very large, approximately 45 feet by 20 feet. (Id. at 79:22—80:11.) There was another ladder on the opposite side that led to the winch deck. (Exhibit A to Van Dyke Depo.) There is no evidence that anything impaired the use of the other ladder. If the coil was in fact in the way, there was a safe alternative route.

### DISCUSSION

Summary judgment should be granted where it is shown that there is no genuine

issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c).

A. *This Open And Obvious Condition Cannot Constitute A Breach Of The Shipowner's Turnover Duty Of Safe Condition.*

■ This case is controlled by Section 5(b) of the Longshore and Harbor Workers Compensation Act, 33 U.S.C. § 905(b), which provides that a longshoreman may bring an action for damages against a shipowner for negligence only. Under this section, a shipowner's duty of care is limited from the former broad duties of the general maritime law. The shipowner's statutory duty of care to the longshoreman is set forth in *Scindia Steam Navigation Co. v. De Los Santos,* 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981). *Scindia* defines five distinct aspects of that duty. The main aspect, and the only one applicable to this case, can be described as the "turnover duty of safe condition". The Court in *Scindia* defined that turnover duty as follows:

> [The shipowner must exercise] ordinary care under the circumstances to have the ship and its equipment in such condition that an expert and experienced stevedore will be able by the exercise of reasonable care to carry on its cargo operations with reasonable safety to persons and property. [*Id.,* 451 U.S. at 167, 101 S.Ct. at 1622.]

The remaining aspects of the vessel's duty are inapplicable to this case.[1]

The Ninth Circuit Court of Appeals recently explained that the "turnover duty" is satisfied by the vessel's,

> ordinary care in light of the fact that the operation will be conducted by an "ex-

pert and experienced" stevedore. This implies that certain dangers that may be hazardous to unskilled persons need not be remedied if an expert and experienced stevedore could safely work around them. [*Bjaranson v. Botelho Shipping Corp., Manila,* 873 F.2d 1204, 1207–08 (9th Cir.1989).]

The court further explained that "the plaintiff must introduce evidence that the hazard was such that an expert and experienced stevedore would not 'be able by the exercise of reasonable care to carry on its cargo operations with reasonable safety to persons and property.' *Scindia,* 451 U.S. at 167, 101 S.Ct. at 1622." *Bjaranson,* 873 F.2d at 1208.

■ Thus, the turnover duty "is not breached if the defect causing the injury was open and obvious and one that the longshoreman should have seen." *Polizzi v. M/V ZEPHYROS II MONROVIA,* 860 F.2d 147, 149 (5th Cir.1988). Celestine surely should have seen a large coil of cable lying on the winch deck in broad daylight. "The shipowner has no duty to anticipate the action or inaction of a careless stevedore." *Id.* Here the presence of a coil approximately four feet in a diameter and one foot high on the winch deck in broad daylight was an open and obvious condition. The shipowner had no duty to anticipate that Celestine would ignore the presence of the coil, which was an open and obvious condition that the stevedore could easily correct, if it was hazardous.

Additionally, the stevedore is under a duty to inspect the areas of the ship where the longshoremen are to be working and to correct any tripping hazards that be there. This duty is derived from the mandatory safety regulations of the Occupational Safety and Health Administration which

---

1. The other four aspects of the *Scindia* duty are as follows: (2) the shipowner must warn the stevedore of hazards that are known or should be known by the shipowner and which are unknown to the stevedore and would not be obvious to him ("turnover duty to warn"); (3) the shipowner must exercise reasonable care if he is actively involved in the cargo operation ("active involvement duty"); (4) the shipowner must exercise reasonable care as to areas and equipment remaining within his control during cargo operations ("active control duty"); and (5) the shipowner must intervene in the stevedore's operations under certain conditions not present here ("intervention duty"). *See Bjaranson v. Botelho Shipping Corp., Manila,* 873 F.2d 1204, 1207 (9th Cir.1989). There is no evidence here that the shipowner was actively involved in the cargo operation or maintained active control of the cargo area or equipment. No one from the ship's crew handled the coil during the cargo operation. (Conti Depo. at 84:23—85:21.)

specify that stevedoring companies are responsible for maintaining certain "housekeeping" standards. One of those standards is that "[w]eather deck walking and working areas shall be kept reasonably clear of lines, bridles, dunnage and all other loose tripping or stumbling hazards." 29 C.F.R. § 1918.91(a).

The Supreme Court in *Scindia* explained that a shipowner is entitled to expect that the stevedore will obey such regulations and is not liable if the stevedore fails to do so:

> As a general matter, the shipowner may rely on the stevedore to avoid exposing longshoremen to unreasonable hazards. Section 41 of the [Longshore and Harbor Workers Compensation] Act, 33 U.S.C. § 941, requires the stevedore, the longshoremen's employer, to provide a "reasonably safe" place to work and to take such safeguards with respect to equipment and working conditions as the Secretary of Labor may determine to be necessary to avoid injury to longshoremen. The ship is not the common employer of the longshoremen [footnote omitted] and owes no such statutory duty to them. [*Scindia*, 451 U.S. at 170, 101 S.Ct. at 1623.]

In *Davis v. Partenreederei M.S. Normannia*, 657 F.2d 1048 (1981), the Ninth Circuit approved a jury instruction specifying "that the sole responsibility for compliance with the regulations of the Occupational Health and Safety Act rest[s] with the employer." (*Id.* at 1053).

Thus, defendant could reasonably rely upon the stevedore to correct any open and obvious tripping hazards on the winch deck, including the coil of wire that plaintiff claims he tripped over.

B. *The Turnover Duty Under Scindia Was Not Broadened By Any Contract Provision, Practice Or Custom.*

■ Celestine argues that defendant's duties were expanded because of its policy that the master is to be responsible for the safety of all aboard the vessel and by contract provisions in the charter party.

While "contract provision, positive law, or custom" may alter the shipowner's duty under *Scindia*, 451 U.S. at 172, 101 S.Ct. at 1624, Celestine has failed to raise a genuine issue of material fact as to the existence of such contract or custom. The charter party between the vessel owners and the Military Sea Lift Command (U.S. Navy) specifies, in part, that:

> [c]argo shall be loaded, stowed trimmed, secured and discharged by the Charterer under the Master's supervision and the Master shall be responsible for such activity as it pertains to the seaworthiness of the Vessel.

There is no evidence that this provision was intended by either of the parties to this charter party to alter the obligations of the vessel towards longshoremen employed by the U.S. Army at the Oakland Army Terminal. This provision, by its own terms, is only relevant "as it pertains to the seaworthiness of the Vessel". Masters of vessels are always ultimately responsible for the seaworthiness of their vessels. This provision obviously is intended to apply to situations where the characteristics of the cargo or its stowage could affect the safe operation (seaworthiness) of the ship. Thus, this provision does not, as a matter of law, expand the turnover duty under *Scindia*.

Similarly, defendant's duty is not expanded by its own ship's officer's guide. Section 4112 of the guide provides that:

> The safety of passengers, longshoremen, repair men, watch, draymen and any others who are not members of the crew but who are properly on board are the legal responsibility of the Master and officers. Their safety must be borne in mind at all times.

There is no evidence that this provision was intended by defendant to expand its duties under *Scindia*. The guide is an instructional guide to provide direction for the ship's officers. It is not a contract. Further, this section is obviously intended to remind the ship's officer's of the importance of being safety conscious. As a matter of law, it does not affect the *Scindia* turnover duty.

The stevedore, not the vessel, has the primary duty to ensure safety and to deal with the customary risks on a ship that are encountered during the stevedoring operation.

## CONCLUSION

Even assuming that all of Celestine's allegations about the accident are true, defendants are not liable. The duty of the shipowner is not to turn over a hazard-free ship but to turn over the ship "in such condition that an expert and experienced stevedore will be able by the exercise of reasonable care to carry on its cargo operations with reasonable safety to persons and property." *Scindia*, 451 U.S. at 167, 101 S.Ct. at 1622. Accordingly, a finding of liability cannot be predicated on an open and obvious condition of the ship. A coil of wire of the alleged dimensions is "open and obvious" as a matter of law. The stevedore did not inspect the area before work began, and neither Van Dyke nor Celestine reported any hazard, and did not correct the position of the coil. Defendant is entitled to summary judgment. Each side shall bear its own costs.