97 F.3d 1460
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
Cora MONDOR, individually, and as heir to the estate of
Edmond J. Mondor, Jr., and as the personal
representative of the estate of Edmond
J. Mondor, Jr., Plaintiff-Appellant,
v.
The VESSEL "HAI MONG"; Hyundai Merchant Marine Corporation;
Graham & James, Defendants-Appellees,
and
Metropolitan Stevedore Company, Claimant.
 No. 94-55077.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Aug. 9, 1995.
Decided Sept. 19, 1996.
 
 1
 Before: BROWNING, NORRIS, and REINHARDT, Circuit Judges
 
 
 2
 MEMORANDUM*
 
 
 3
 Edmond Mondor, Jr. was killed while working aboard the vessel Hai Mong. Appellant Cora Mondor, Edmond Mondor's widow, brought this wrongful death and survival action under the Longshoremen's and Harbor Workers' Compensation Act, which gives longshoreworkers a cause of action against a vessel for negligence. See 33 U.S.C. § 905(b).[1] After the jury deadlocked 6-2 in favor of the defendants on the question of liability, the district court declared a mistrial. The district court then granted judgment as a matter of law pursuant to Fed.R.Civ.P. 50(b) in favor of the defendants.
 
 
 4
 We review de novo a judgment entered as a matter of law. Montiel v. City of Los Angeles, 2 F.3d 335, 342 (9th Cir.1993). The standard for granting judgment as a matter of law is the same as the standard previously applied to motions for directed verdict. See Fed.R.Civ.P. 50 advisory committee's note to 1991 amendment. "A directed verdict is proper when the evidence permits only one reasonable conclusion as to the verdict.... We consider all of the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party." In re Hawaii Federal Asbestos Cases, 960 F.2d 806, 816 (9th Cir.1992) (quoting Peterson v. Kennedy, 771 F.2d 1244, 1256 (9th Cir.1985), cert. denied, 475 U.S. 1122 (1986)).
 
 
 5
 * Edmond Mondor, Jr. was Ship Boss aboard the Hai Mong at the time of the accident. The Ship Boss is the stevedore supervisor primarily responsible for the safety of all shipboard cargo operations. A Ship Boss directly supervises the stevedore hatch bosses on board the vessel, who in turn directly supervise the longshoreworkers.
 
 
 6
 Hatch Boss Raymond Matthews originally had the job of directing the cargo operation in which Mondor was later killed. Prior to the accident, Matthews and the longshoreworkers were moving cargo into position in the hold. The vessel's Chief Mate, Jong Kyu Lee, who was observing the operation from above, decided that the cargo would be safer if stowed in a different position next to a load of pipe stow. He so advised the vessel's Second Officer who was in the hold, and the Second Officer communicated this request to Matthews. Matthews testified that he considered the proposed operation and decided that it would be unsafe because he would have to stand on top of the pipe stow, at the edge of a 14 foot drop, to direct the operation. It is undisputed that he told certain unidentified crewmembers that he would not carry out the operation because the working conditions were unsafe. The crewmembers then had a conversation with the vessel's Chief Mate, but what was said in that conversation is a matter of dispute. The Chief Mate then sought out Mondor and Superintendent Leo Langle, Mondor's superior. It is undisputed that the Chief Mate did not tell Mondor and Langle about Matthews's safety concerns. Either Langle or Mondor then ordered Matthews to carry out the operation as requested, and Matthews did so.
 
 
 7
 There is no evidence suggesting that Mondor thought the move was unsafe; only Matthews expressed concern. Mondor, who was Matthews's boss, later relieved Matthews in directing the cargo move with no apparent concern about the safety of the operation. While standing at the edge of the pipe stow, Mondor signaled to the crane to swing a load of cargo into place, which it did. The vessel's Second Officer then gestured to Mondor to move the load in closer. To accomplish the cargo move, Mondor directed one of the longshoreworkers, Louie De La Cruz, to unhook two of the crane's hooks from the load. After unhooking them, De La Cruz wanted to "bury" them, that is, attach them to the cable on the other side so they would not be free to swing. However, when Mondor signaled to De La Cruz not to bury the hooks, De La Cruz left them unattached. When the crane moved, one of the unattached hooks got caught and then suddenly swung loose, striking Mondor and causing him to fall over the edge of the pipe stow to the floor 14 feet below.
 
 II
 
 8
 As a general rule, once stevedore operations begin, the stevedore rather than the vessel is responsible for the safety of the cargo operations. Scindia Steam Navigation Co. v. De Los Santos, 451 U.S. 156, 172 (1981) ("the shipowner has no general duty by way of supervision or inspection to exercise reasonable care to discover dangerous conditions that develop within the confines of the cargo operations that are assigned to the stevedore"). Mrs. Mondor relies on an exception to this general rule, that vessels owe the stevedore a duty of care if the vessel "actively involves itself in the cargo operations...." See Scindia, 451 U.S. at 167; see also Bjaranson v. Botelho Shipping Corp., 873 F.2d 1204, 1207 (9th Cir.1989). Mrs. Mondor advances two factual theories for holding the Hai Mong liable for her husband's death under the "active involvement" exception.
 
 
 9
 1. The Second Officer's Instruction to Move the Cargo Closer to the Pipe Stow Caused Mondor's Death
 
 
 10
 Mrs. Mondor's first theory of liability is that the vessel is liable for Mondor's death because the Second Officer became actively involved in moving the cargo when he instructed Mondor to move the cargo closer to the pipe stow. The question is whether there is sufficient evidence to support a finding that this instruction proximatedly caused Mondor's fall from the pipe stow.
 
 
 11
 Mrs. Mondor argues that the Second Officer caused Mondor's death by effectively overruling Mondor's decision about where the cargo should be positioned. She reasons that the load was "close enough [to the pipe stow] from the perspective of Mondor's 38 years' stevedoring. But Mondor was not in charge. The Second Officer instructed him to move the load closer. Unquestionably Mondor could have stopped the job, but that does not excuse the negligence of the vessel's officers." Appellant's Opening Brief at 15.
 
 
 12
 The Hai Mong responds that although the Second Officer requested that the cargo be moved, he did not tell Mondor or anyone else how the cargo should be moved and that it was Mondor specifically who decided not to bury the hooks and not to use a safer method of moving the cargo.
 
 
 13
 We agree with the district court that there is no evidence to support Mrs. Mondor's argument that Mondor made a decision or formed an opinion that moving the cargo would be unsafe. The district court ruled that the evidence showed, and there was no evidence to the contrary, that the proximate cause of Mondor's death was his own decision to move the cargo in an unsafe way. The district judge explained:
 
 
 14
 It was Mr. Mondor who: 1) directed the holdman to leave only one side of the cargo gear secured, leaving the other side free to swing; 2) gave the signals to the crane operator to lift the cargo; and 3) determined where he should stand to direct this operation. Neither the Chief [Mate] nor the officers in the hold participated in any of these operations or gave any instructions to Mr. Mondor about the method to be used to move the cargo.
 
 
 15
 District Court's Findings of Fact and Conclusions of Law, filed Dec. 13, 1993, at 6. Further, the district court ruled that Mondor could have used alternative means of moving the cargo that would have avoided the danger of the swinging hook. However, "[n]one of these precautions were used or attempted by the stevedore personnel during the movement of the cargo to the athwartship position." Id. at 7.
 
 
 16
 We agree with the district court. The law is well settled that, while the vessel is responsible for telling the stevedore where to place the cargo, the stevedore is responsible for deciding how the cargo is moved. "It is settled maritime custom and practice that the stevedore exercises primary control over the details of a cargo operation.... [I]t is the stevedore, an independent contractor hired for its expertise in the stowage and handling of cargo, that is charged with actual implementation of the [stowage] plan." Howlett v. Birkdale Shipping Co., 114 S.Ct. 2057, 2066 (1994). This rule "rests upon 'the justifiable expectations of the vessel that the stevedore would perform with reasonable competence and see to the safety of the cargo operations.' " Id. at 2065 (quoting Scindia, 451 U.S. at 172).
 
 
 17
 The evidence showed, and there was no evidence to the contrary, that Mondor's death was caused by his own actions and not by any actions on the part of the crew. All of the witnesses were in agreement that the decision to move the cargo using two hooks while leaving the other two free to swing was made by Mondor alone. First, they all testified that although the Second Officer gestured to Mondor to move the cargo closer to the pipe stow, he did not tell Mondor how to move it. Three witnesses were present at the time the Second Officer gestured to Mondor to move the load closer. Elena Velasquez, who was standing on top of the pipe stow with Mondor and the Second Officer, testified that the Second Officer "was looking down where the cargo was trying to go against the pipe. And he was pointing, like, to make it go tighter against the pipe." Robert Canales also testified that the Second Officer was gesturing, and that he understood that the Second Officer wanted the load tighter and closer. Louie De La Cruz, the third longshoreworker involved in the operation, merely testified that he saw the Second Officer "making gestures....".
 
 
 18
 Second, it is undisputed that Mondor himself made the decision to leave the hook that caused his death free to swing. Louie De La Cruz testified specifically that Mondor told him to unhook it. De La Cruz further testified that he wanted to "bury" the hook so that it would not be able to swing, but that he was "given a gesture not to" by Mondor. De La Cruz explicitly stated that the crew did not tell him to unhook the hooks, nor did it give any signals to the crane operator. In sum, we agree with the district court that, as a matter of law, the proximate cause of Mondor's death was his own decision not to bury the hooks, not the Second Officer's instruction to move the cargo closer to the pipe stow.
 
 
 19
 Mrs. Mondor responds that the Second Officer's instruction caused Mondor's death because the Second Officer "wanted the load closer than Mondor wanted it.... [Mondor] thought the load was close enough ... but the Second Officer overruled him." Appellant's Reply Brief at 14 (without citation to the record). The district court rejected this argument, holding that there was no substantial evidence that the crew overruled the stevedore's decisions. We agree. Even if we assume that the Second Officer had the authority to overrule Mondor's decisions about how to carry out the cargo-moving operation, there is no evidence that Mondor in any way objected to the direction to move the cargo closer or that he was overruled. Rather, all that the evidence shows is that the Second Officer gestured to Mondor to move the load closer, and that Mondor undertook to do so.
 
 
 20
 Mrs. Mondor also responds, in an argument not made to the jury, that the Hai Mong is responsible for Mondor's decision about how to move the cargo because it exerted time pressure that foreclosed other safer methods of moving the cargo, such as removing the hook or bringing a forklift aboard. This argument fails for three reasons.
 
 
 21
 First, there is no basis for a finding that burying the hooks would have been too time-consuming because there is no evidence indicating how long it would have taken to bury the hooks. There is nothing in the record suggesting that it would have caused any delay at all.
 
 
 22
 Second, there is no basis for a finding that removing the hooks from the vessel (as distinguished from burying the hooks) or bringing a forklift aboard would have been too time-consuming. Mrs. Mondor's expert witness testified that bringing a forklift aboard would have taken 15 to 25 minutes, and removing the hooks from the vessel would have taken approximately 30 minutes. However, there is no basis for a finding that either of these options would have been too time-consuming because there is no evidence of how much time was available to finish the cargo operations. Without record citation, Mrs. Mondor contends that Mondor knew when he took over the cargo operations at 3:30 p.m. that the vessel was due to sail at 5:00 p.m. The Hai Mong correctly responds that this assertion is unsubstantiated by the record. Mrs. Mondor cites no evidence about the ship's sailing time, and we have found none in the record. Mrs. Mondor also marshalls the testimony of Chief Mate Lee to support her claim that Mondor felt time pressure to complete the loading. The Chief Mate testified that he had a discussion with Mondor in which the Chief Mate requested that the crew be allowed to go into the hatch where the longshoreworkers were conducting the cargo operations. The Chief Mate testified that he made the request "since we did not have much time...." This testimony may permit an inference that the Chief Mate told Mondor during that discussion that the vessel did not have much time, but it does not support a finding that there was insufficient time to remove the hooks or bring a forklift aboard.
 
 
 23
 Finally, Mrs. Mondor's argument fails because there is no evidence that Mondor thought there was no time to remove the hooks or bring a forklift aboard. In fact, there is no evidence that Mondor even considered these alternatives, or if he did, that he rejected any of them because of time pressure. Finally, there is no evidence that there was no time to bury the hooks, as De La Cruz wanted to do before he was overruled by his boss, Mondor. In sum, there is no evidentiary basis for a finding that the vessel proximately caused Mondor's death by exerting time pressure that forced him to carry out the cargo operation in an unsafe manner, specifically, by using two hooks and leaving the other two free to swing.
 
 
 24
 2. The Hai Mong's Chief Mate Deliberately Concealed Matthews's Safety Concerns from Mondor
 
 
 25
 Mrs. Mondor's second theory of liability, which she raises for the first time on appeal,[2] is that the vessel became actively involved in cargo operations and negligently caused Mondor's death when "the Chief Mate mislead [sic] the stevedore into requiring the longshoreworkers to continue a job the Hatch Boss [Matthews] had determined to be unsafe." Appellant's Opening Brief at 13-14. "The accident happened as a proximate result of the ship's officers outmaneuvering Matthews, Langle and Mondor and forcing the job to be done without proper safety precautions." Appellant's Reply Brief at 14. Mrs. Mondor argues that the evidence would permit a jury to find that the Chief Mate learned that Matthews had refused the job because it was unsafe, and then deliberately withheld this information from representatives Superintendent Leo Langle and Mondor. The threshold problem with this theory, other than its appearance for the first time on appeal, is that there is no evidence that the Chief Mate knew anything about Matthews's safety concerns. In her opening brief, Mrs. Mondor argues that "[Matthews] told the Chief Mate it was unsafe," Appellant's Opening Brief at 7, and cites Matthews's testimony. However, as the Hai Mong points out in its brief, Matthews did not testify that he told the Chief Mate it was unsafe. Rather, Matthews testified that he told certain unidentified crewmembers in the hatch.
 
 
 26
 In response, her reply brief offers a different version of how the Chief Mate was supposedly informed of Matthews's safety concerns. There she contends that "Matthews had an extended conversation with the crewmembers in the hold.... This was followed by a shouted conversation between crewmembers in the hold and the Chief Mate at the coaming. Matthews was persuaded that the Chief Mate was fully informed...." Appellant's Reply Brief at 5 (citations omitted). However, the testimony does not support a finding that the crewmembers in the hold actually told the Chief Mate about Matthews's safety concerns. None of the stevedore personnel testified that they heard what the crewmembers in the hold said to the Chief Mate at the coaming. Indeed, one of the longshoreworkers in the hold, Robert Canales, testified that this conversation was in Korean. Mrs. Mondor's contention that Matthews was persuaded that the Chief Mate was fully informed provides no support for her theory. In the testimony to which she refers, Matthews was asked "And do you know if that discussion with regards to safety was communicated up the chain of command on the Vessel, on to the Stevedore?" to which Matthews responded, "Yes." We do not regard Matthews's ambiguous answer as evidence that the Chief Mate actually learned of Matthews's safety objections. Matthews only answered that he knew whether the safety discussion was communicated up the chain of command; he did not testify whether to his knowledge the discussion was or was not so communicated.
 
 
 27
 The only witness who testified about what was said between the crew in the hold and the crew on deck was the Chief Mate, who testified that his Second Officer told him that the longshoreworkers did not want to move the cargo into the requested position but that he could not recall why not. He said he believed that the longshoreworkers did not wish to move something that had already been moved once.
 
 
 28
 In sum, there is evidence that Matthews told the crewmembers in the hatch about his safety concerns, and there is evidence that these crewmembers communicated with the Chief Mate, but there is no evidence that these crewmembers told the Chief Mate about Matthews's safety concerns.
 
 
 29
 Moreover, even if the Chief Mate had known about Matthews's safety concerns, the responsibility for the safety of the cargo operations nevertheless rested with the stevedore because, as the district court held, "the stevedore and not the ship's personnel decided to go forward with the operation requested; ..." District Court's Findings of Fact and Conclusions of Law, at 9. The Hai Mong argues, and Mrs. Mondor does not dispute, that Langle could see the fourteen foot drop when he decided to go forward with the operation.[3] Langle specifically testified that he looked into the hatch and he could see Matthews standing on top of the pipe stow. Indeed, Mrs. Mondor argued to the district court that Langle, who was "the highest person in the chain of command for the Stevedore, ... after deciding to acquiesce in the ship's orders to move the cargo athwartship, despite the danger presented of which he and the Chief Mate knew, told the hatch boss to follow the directions and orders of the ship's crew; ...." Plaintiff's Mem. of P. & A. in Supp. of Opp'n to Defendant's Mot. for J. as a Matter of Law, filed Nov. 8, 1993, at 6-7 (emphasis added).
 
 
 30
 The evidence showed that Superintendent Langle did not believe it was unsafe to carry out the ship's stowage request. Langle testified that the Chief Mate called him over to the hatch to request that the cargo be shifted to an athwartship position. Langle, accompanied by Mondor and the Chief Mate, then went to the hatch, where he could see Matthews and one or two crewmembers standing on top of the pipe stow, and another person in the open section of the hatch. Mondor then conveyed the Chief Mate's stowage request to Matthews below, who did not say anything in response. Langle testified that, although it was Mondor who actually conveyed the request, he himself agreed with that decision. Langle specifically testified that he did not see anything in the hatch that he thought represented an unsafe condition, and that Mondor did not say anything to the Chief Mate about the operation being unsafe.[4]
 
 
 31
 Thus, all of the evidence is in accord that, upon receiving the Chief Mate's request to move the cargo again, Mondor and Langle observed the cargo situation, saw nothing unsafe, and ordered the longshoreworkers to carry out the change. The responsibility for making the decision to proceed with the operation thus rested with the stevedore. There is no basis in the evidence for holding the Hai Mong responsible for that decision.
 
 
 32
 In sum, Mrs. Mondor has not presented sufficient evidence to create a triable issue of fact as to whether the Hai Mong caused Mondor's death. Accordingly, the judgment of the district court is AFFIRMED.
 
 
 33
 REINHARDT, Circuit Judge, dissenting.
 
 
 34
 In the posture in which this case comes to us, we can affirm only if the evidence, viewed in the light most favorable to Mrs. Mondor, as the nonmoving party, could not reasonably support a verdict for her. Dean v. Trans World Airlines, Inc., 924 F.2d 805, 810 (9th Cir.1991). I believe that the majority improperly deprives Mrs. Mondor of the reasonable inferences to which she is entitled, and, therefore, I dissent. I need offer only two examples to illustrate my disagreement with the unfortunate approach to fact-finding the majority employs throughout its disposition. Both fairness and the law would have been better served had the majority been satisfied to let the jury do its job, and not felt compelled to resolve the various factual questions that should, for the purposes of this appeal, have been resolved in favor of Mrs. Mondor.
 
 
 35
 The majority finds that "there is no evidence that the Chief Mate knew anything about Matthew's safety concerns." Majority Opinion at 12. I find that assertion baffling. In the light most favorable to Mrs. Mondor, the record supports the following. Due to time constraints, the Chief Mate took the unusual step of securing permission for crew members to be in the hatch to assist in the overstow operation. [RT 10/5: 62]. While the project was underway, the Chief Mate, standing at the coaming above, yelled down to the Second Officer, standing on the pipes near Matthews, to move the cargo athwartship. [RT 10/5: 58]. When ordered by the crew to move the cargo athwartship, against the pipe stow, Matthews refused, concluding that the operation could not be done safely, and communicated his concerns to the crew members in the hatch. [RT 9/30: 143-144]. After that communication, a loud discussion occurred between the crew members working below and the Chief Mate standing at the coaming observing the project. [RT 9/30: 144-145]. The Chief Mate then went to find the Ship Boss to get him to intervene. [RT 10/4: 91].
 
 
 36
 On these facts alone, a jury could reasonably infer that the conversation between the crew members and the Chief Mate concerned the reason for the work stoppage. In fact, it would seem unreasonable not to draw such an inference. The task in the hold was obviously a priority to the ship, set to leave port soon. Matthews stopped the work out of fear for his safety. The crew then yelled up to its Chief Mate. How could it possibly be unreasonable to conclude that the crew members in the hatch were communicating their concerns to the Chief Mate, who was monitoring the situation from above. I am unable to fathom exactly what else the majority imagines that conversation to have been about.
 
 
 37
 Moreover, Matthews himself offered direct evidence to support this inference. As noted by the majority, Matthews was asked at trial, "And do you know if that discussion with regards to safety was communicated up the chain of command on the Vessel, on to the Stevedore?" Matthews responded, "Yes." [RT 9/30: 144]. The majority disposes of this testimony through a pinched, overly literal reading; yet, even with that unreasonable reading the worst that can be said is that Matthews' statement is "ambiguous." Majority Opinion at 13. In reviewing the directed verdict, ambiguity must be resolved in favor of Mrs. Mondor.
 
 
 38
 The majority completely ignores a second statement by Matthews in which he characterizes his impressions regarding the discussion at issue:
 
 
 39
 Q. ... Did you hear any yelling, or talking, or communications from the Chief Mate, down to the crew members down in the Hatch with you?
 
 
 40
 A. Yes.
 
 
 41
 I started the yelling. Because I didn't want to turn the cargo. Because I felt it was unsafe. You have to stand on end.
 
 
 42
 And it was communications between people on the deck and the Chief Mate on top.
 
 
 43
 [RT 9/30: 145]. No doubt the majority could also dispose of this testimony as "ambiguous." I, however, find in both statements sufficient evidence to support a jury finding that the Chief Mate was on notice regarding Matthews's safety concerns: that was clearly the impression that Matthews had at the time, and he was certainly in a better position to make that assessment than we are now. The jury was not required to believe him, but it was entitled to if it did.
 
 
 44
 I also disagree also with the majority's assertion that "there is no evidentiary basis for a finding that the vessel proximately caused Mondor's death by exerting time pressure that forced him to carry out the cargo operation in an unsafe manner...." Majority Opinion at 11. The disposition here turns largely on the fact that the majority is unable to find any reference in the record to the vessel's departure time. Without the exact time the vessel was due to sail, the majority is unable to make a mathematical calculation as to whether or not Mondor's actions were reasonable in light of the imminent departure, and it accordingly concludes that there is no evidence of proximate cause. That analysis misses the point and ignores ample evidence in the record regarding "time pressure."
 
 
 45
 Again the extraordinary fact of the presence of crew members in the hatch, working alongside the longshoremen, contrary to usage and custom, is indicative of the ship's desire to get the project completed in a hurry. Moreover, as noted above, the Chief Mate himself testified that he secured permission from Mondor for the crew members to be in the hatch because "we did not have much time." [RT 10/5: 62].
 
 
 46
 Finally there is the evidence of Mrs. Mondor's expert witness, Conrad G. Guzman, regarding the alternative of using a forklift:
 
 
 47
 Q. Was it reasonable, given the circumstances that you have been asked to assume to be true, and given the time, and given the involvement of The Vessel's Crew [sic]?
 
 
 48
 A. No. To use a hoister, at the time, it would not have been feasible. No.
 
 
 49
 [RT 10/1: 114]. The expert also testified that Mondor and Matthews acted reasonably in positioning themselves at the edge of the pipe stow because "that was the only position he could have put himself in, to to [sic] give the proper signals." [RT 10/1: 81]. Accordingly, I conclude that a jury could find that the vessel's negligence was a proximate cause of Mondor's death, on the basis that the time pressure constituted a substantial factor in placing Mondor at risk. The swinging hooks did not alone bring about Mondor's death: Whatever it was that caused him to be stationed over fourteen feet in the air, leaning over the edge of the pipe stow, was a necessary factor in the injury that resulted.
 
 
 50
 Mondor may well have contributed to his own death by his order that the hooks not be buried, and his actions may well have been a proximate cause in the chain of events leading up to his injury. However, whether or not Mondor contributed to his own death is irrelevant at this point in the proceeding since neither assumption of risk or contributory negligence is a defense under the LWCHA. Scindia Steam Navigation Co. v. De Los Santos, 451 U.S. 156, 165 n. 13 (1981). The only issue before us is whether a jury could find that the vessel contributed to his death in a way that constitutes proximate cause. I believe that a reasonable jury could so find.
 
 
 51
 Accordingly, I dissent.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36-3
 
 
 [1]
 § 905(b) provides in relevant part:
 (b) Negligence of vessel. In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party.... If such person was employed by the vessel to provide stevedoring services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing stevedoring services to the vessel.
 33 U.S.C. § 905(b).
 
 
 [2]
 Because it was raised for the first time on appeal, this theory was not addressed by the district court
 
 
 [3]
 Mrs. Mondor responds only that, at the time Langle gave the order to proceed, "[n]either [Langle nor Mondor] went into the hold or analyzed the safety aspects of the job, leaving that to Matthews ..." Appellant's Opening Brief at 8. She cites no evidence to support this assertion. Our own review of the record reveals that Langle did not testify that he failed to analyze the safety aspects of the job, or that he left the safety analysis to Matthews
 
 
 [4]
 Langle's testimony conflicts with other evidence on two points that are not material to the question whether the decision to proceed with the operation was made by stevedore personnel. First, Matthews testified that, at the time Langle ordered him to proceed, he personally told Langle about his safety concerns. Langle testified that Matthews did not. Second, there is disagreement about whether the order to proceed was actually given by Langle or Mondor. Langle and the Chief Mate testified that Mondor gave the order, whereas Matthews testified that Langle did and that Mondor was not present at the hatch coaming. These conflicts are not, however, material. It remains undisputed that the order to proceed was given by either Langle or Mondor, both stevedore personnel