Joseph **DINO** and Patricia **Dino**, Plaintiff,

v.

**FARRELL LINES, INC.**, SS Argonaut, ABC Vessel Owner 1–10 (10 being fictitious and unknown), John Doe Master Officer 1–10 (10 being fictitious and unknown), XYZ Maintenance Company 1–10 (10 being fictitious and unknown) v. American Maritime Services, Inc.

No. Civ.A. 99–1155(AJL).

United States District Court, D. New Jersey.

Dec. 1, 1999.

Robert G. Leonard, John Scott, Leonard & Butler, Morristown, NJ, for plaintiffs.

Carol N. Lambos, Peter A. Junge, Lambos & Junge, Bayonne, NJ, for defendant Farrell Lines, Inc.

William J. Riina, Matthew S. Mahoney, Wilson, Elser, Moskowitz, Edelman & Dicker, Newark, NJ, James W. Bartlett, III, Wilson, Elser, Moskowitz, Edelman & Dicker, Baltimore, MD, for defendant American Maritime Services, Inc.

## OPINION

LECHNER, District Judge.

This is an action by plaintiffs Joseph Dino ("Dino") and Patricia Dino (collectively "Plaintiffs"), against defendants, Farrell Lines, Inc., SS Argonaut ("Farrell") and also, by third-party plaintiff, Farrell, against third party-defendant, American Maritime Services, Inc. ("AMS") (collectively "Defendants"). Plaintiffs filed a Complaint (the "Complaint") in the Superior Court of New Jersey, Law Division, Union County alleging damages, under Section 905(b) of the Longshore and Harbor Workers' Compensation Act (the "Act" or "LHWCA"), 33 U.S.C. § 905(b), for personal injuries sustained from a slip and fall aboard SS Argonaut. Patricia Dino, Dino's wife, asserted a derivative claim based upon the loss of consortium, services and society. Currently pending is Farrell's motion for summary judgement (the "Motion for Summary Judgment")[1], in

1. In support of the Motion for Summary Judgment Farrell submitted:

which AMS has joined. The Motion for Summary Judgment is granted for the reasons set out below.

*Facts*

A. *Parties*

Plaintiffs are New Jersey residents. *See* Complaint. Dino was employed as a longshoreman by Maher Terminals, Inc. ("Maher"), an independent stevedore company, in Port Elizabeth, New Jersey. *See id.*, Count 1, at ¶ 4. Dino, worked as a longshore worker for more than thirty years, and at the time of the accident worked as a hatch boss for Maher. *See* Lambos Declaration, Exhibit J (deposition transcript of Joseph Dino) ("J. Dino Dep.") at 15–21. Dino began his career as a holdsman and through the years was promoted to dockman and deckman. *See id.* at 16–21. As a hatch boss, Dino had his own gang,[2] which was referred to as "Dino's gang"; it consisted of nine workers. *See id.* at 24. Dino described his job as "[g]etting the gang together, seeing that they produce, or any problems with them tying up the ships, shifting ships, general management of the gang and their production." *Id.* at 21.

Farrell is a Delaware corporation with its principal place of business located in the New York, New York. *See* Notice of Removal ¶ 1. Farrell was "at all relevant

1. Verified Declaration of Carol N. Lambos (the "Lambos Declaration"), attaching Exhibits A through N;
2. Statement of Uncontested Facts pursuant to L.Civ.R. 56.1 ("Rule 56.1 Statement");
3. Memorandum of Law in Support of Defendant's Motion for Summary Judgment (the "Moving Brief");
4. Verified Declaration of Joseph Farley (the "Farley Declaration") and
5. Reply Memorandum of Law in Support of Defendant's Motion for Summary Judgment (the "Reply Brief").

In support of the Motion for Summary Judgment AMS submitted:
1. Verified Declaration of Matthew Mahoney (the "Mahoney Declaration") and
2. Memorandum of Law in Support of Farrell Lines Incorporated and Joinder in that Motion (the "AMS Brief").

times the operator, owner pro hac vice and bareboat charterer of the SS Argonaut." *Id.* Farrell conducts business in New Jersey and maintains a business address in Elizabeth, New Jersey. *See* Complaint, Count 1, ¶ 1. SS Argonaut is an American-flag container ship operated by Farrell. *See* Lambos Declaration ¶ 3.

AMS is a general maritime services independent contractor. *See* Mahoney Declaration ¶ 3. AMS was engaged by Farrell on 18 January 1997 to perform snow and ice removal services on the deck of SS Argonaut. *See id.*

B. *Procedural History*

On 6 January 1999, Plaintiffs filed the Complaint alleging injuries in relation to an accident that occurred aboard SS Argonaut 18 January 1997. *See* Complaint. The Defendants filed a notice of removal alleging admiralty jurisdiction, pursuant to 28 U.S.C. § 1333, and diversity jurisdiction, pursuant to 28 U.S.C. § 1332.

On 23 March 1999, Farrell filed an answer to the Complaint and also filed a third-party complaint (the "Third–Party Complaint") naming AMS as a third-party defendant. On 15 April 1999, a scheduling order ("15 April 1999 Scheduling Order") was issued setting 30 July 1999 as the cutoff for discovery.[3]

In opposition to the Motion for Summary Judgment Plaintiffs submitted:
1. Certification of R. Gregory Leonard (the "Leonard Certification"), attaching Exhibits A through E;
2. Plaintiffs' Memorandum in Opposition to Motion for Summary Judgment of Farrell Lines, Inc. and American Maritime Service of New York, Inc. (the "Opposition Brief").

2. The term "gang" refers to the longshore workers assigned to work a specific area of the ship.

3. As part of the 15 April 1999 Scheduling Order, the parties were required to answer interrogatories from the court no later than 24 May 1999. The Plaintiffs have not done so. Moreover, Plaintiffs have not offered expert witness data, as required by Rule

### C. Background

#### 1. 17 January 1997

On 17 January 1997, Charles Andrews ("Andrews"), Farrell's Port Manager, received a phone call from the Master of SS Argonaut concerning an accumulation of snow and ice on the deck of the incoming vessel. *See* Lambos Declaration, Exhibit H (the deposition testimony of Charles Andrews) ("Andrews Dep.") at 7, 35. The Master also informed Andrews that the crew was cleaning the deck, but that further assistance might be needed upon arrival of SS Argonaut at Port Elizabeth. *See id.* at 35.

In response to the call, Andrews retained AMS to perform snow and ice removal services on SS Argonaut upon its arrival at Maher on 18 January 1997. *See id.* AMS agreed to send a crew to remove the snow and ice and then perform the unlashing of the ship. Andrews also communicated with Maher, the stevedore company employed to unload SS Argonaut, to warn it about the condition of the vessel. *See id.* at 116; Lambos Declaration, Exhibit K (Verified Declaration by Scott Stahl of Maher) ("Stahl Declaration") ¶ 12 ("On or about January 17, 1997, I was notified that Farrell warned Maher that the SS ARGONAUT would be arriving with snow and ice accumulated on the vessel. I was also informed that Farrell had arranged for shore workers to perform snow and ice removal services upon the vessel's arrival at Maher.").

#### 2. 18 January 1997: Before Turn Over

Dino arrived at work at approximately 6:00 o'clock a.m. on 18 January 1997. *See* Leonard Certification, Exhibit B (Certification of Joseph Dino) ("Dino Certification") ¶ 2. SS Argonaut docked on the starboard side of its berth at Maher terminal and "finished with engines" was ordered at 6:48 o'clock a.m. on 18 January

26(a)(2), even though the 15 April 1999 Scheduling Order required disclosure of such

1997. *See* Lambos Declaration, Exhibit L (Deck Log of SS Argonaut) ("Deck Log"). Dino assisted in tying up SS Argonaut shortly before 7:00 o'clock a.m. *See* J. Dino Dep. at 37; Dino Certification ¶ 2. At 7:30 o'clock a.m. the AMS snow and ice removal crew boarded the vessel to begin snow and ice removal. *See* Deck Log.

The Ship Superintendent from Maher, Scott Stahl ("Stahl") testified that he boarded SS Argonaut and conducted an inspection before the turnover and before stevedore operations began at 8:00 o'clock a.m. *See* Stahl Declaration ¶¶ 1, 14. Stahl testified that upon turnover "the areas on deck where longshoremen would be working were free of snow and ice and reasonably safe for cargo operations." *See id.* at ¶ 16. Specifically, Stahl stated:

> Shortly after my arrival at the terminal, I boarded the SS ARGONAUT to inspect the vessel to determine if stevedoring operations could be performed safely and for defects and unsafe conditions aboard the vessel that might make cargo operations dangerous. **I performed this inspection with the knowledge that the vessel arrived with snow and ice accumulations that required snow and ice removal services.** To perform my inspection I walked about the areas of the vessel where cargo operations would be performed including but not limited to the in-shore decks, the weather decks and cross walks between the hatches. In addition, I performed a visual inspection of the areas surrounding the cargo working area of the vessel. **There were no conditions or equipment aboard the vessel at that time that would have prevented my complete inspection of the vessel or obscured my views of the cargo operations area.**

*Id.* at ¶ 14 (emphasis added). Stahl indicated that it is known in the stevedore industry that at Maher during "cold

information be made by 18 June 1999.

weather it is common for vessels to arrive at the terminal with accumulations of snow and ice." *Id.* at ¶ 18. Joseph Farley, Safety Director for Maher, testified that it is known both at Maher and "in the stevedoring industry in general, that if snow and ice accumulates [sic] during stevedoring operations which render work conditions unsafe, longshoremen should stop work." Farley Declaration ¶ 6.

On the morning of 18 January 1997, Stahl testified that in the course of his inspection he

> found the vessel to be free of ice and snow in areas where cargo operations were to take place. [He] saw evidence of snow and ice removal activity in that [he] saw rock salt spread on the decks and in the areas where the longshoremen would be working. Moreover, [he] saw extra bags of rock salt left on the deck. Since [he] was aware that snow and ice on a vessel could pose a risk during cargo operations, [he] took special care with [his] inspection to see that the snow and ice removal operation was properly accomplished. At the end of [his] inspection, [he] was satisfied that the vessel was reasonably safe for stevedoring operations.

Stahl Declaration at ¶ 15. Further, Stahl commented that the deck area "remained safe throughout the entire day." *Id.* at ¶ 16.

### 3. *Existence of Ice on Deck*

Andrews testified that at approximately 6:30 o'clock a.m.[4] on 18 January 1997, in keeping with his normal practice, he boarded SS Argonaut. *See* Andrews Dep. at 28. Upon boarding SS Argonaut, Andrews testified that he observed a layer of ice between a half inch and one inch in thickness. *See id.* at 26. Andrews testified AMS had been hired to "put salt down and shovel the snow or ice that would be there from the salt." *Id.* at 23.

Andrews indicated that he met with the Chief Mate to discuss the stowage plan for the vessel. *See id.* at 29, 33. After this meeting, which lasted approximately thirty minutes, Andrews testified that he went to check the progress of the AMS workers in clearing the snow and ice. *See id.* at 35, 43. Andrews testified he walked "the fore and aft, the starboard passageway looking down the authorized ship's passageways, walkways" and found that the AMS workers were performing ice and snow removal procedures. *See id.* at 44. Upon seeing the AMS workers performing the snow and ice removal, Andrews left the vessel to resume his other job responsibilities. Andrews experienced no difficulty while walking on the deck of SS Argonaut. *See id.* at 48.

Dino testified that he was on the dock around 8:00 o'clock a.m. when unlashing began on SS Argonaut and he "never saw Charles Andrews or Scott Stahl on the dock or on the Argonaut." Dino Certification ¶ 3. However, Dino acknowledged in substance that he was off the dock when he stated that at 8:00 o'clock a.m. he went to the office area to warn up and see the schedule for his gang. *See id.* at ¶ 7. Manuel Trueba ("Trueba"), a member of Dino's gang, also testified that he did not see Stahl in the vicinity of SS Argonaut before 9:30 o'clock a.m. *See* Leonard Certification, Exhibit D (Certification of Manuel Trueba) ("Trueba Certification") ¶ 3.[5] Trueba did testify, however, that as a longshore worker he worked through all kinds of weather and that the ice on the deck of SS Argonaut was the type of condition he had to "confront and work around as best

---

4. In light of the entry in the deck log stating that the ship did not dock until 6:48 o'clock a.m., Andrews testimony that he boarded the vessel at 6:30 o'clock a.m. appears to be incorrect. Nevertheless, this discrepancy is immaterial to the resolution of the Motion for Summary Judgment.

5. The statements of Dino and Trueba do not create a genuine issue of material fact because neither contests the presence of Stahl on the vessel. The issue is not whether either Dino or Trueba "saw" Stahl on the deck or on the vessel.

[he could] in order to keep the ship on schedule." *Id.* at ¶ 5.

Although Dino testified that he noticed ice on the vessel, he did not warn his gang to take any precautions and, indeed, he did not himself take any particular precautions. *See* J. Dino Dep. at 50–51. As well, Dino testified that even though Maher always had a safety man on duty, he did not speak with him on 18 January 1997. *See id.* at 52, 82–83; *see also* Stahl Declaration ¶ 21. In fact, Dino testified that the presence of ice did not constitute a reason to call the safety man. *See* J. Dino Dep. at 51–53.

### 4. *The Accident*

Around 9:00 o'clock a.m., Stahl asked Dino to address a problem Robert Ruiz ("Ruiz"), a relatively new crane operator in Dino's gang, was having in removing one of the hatches from the ship. *See id.* at 57. Dino boarded the vessel via the gangway and walked along the open weather deck to the hatch his gang was working. *See id.* at 59–60.

Dino testified he was the first member of the gang to board the ship. *See id.* at 51. Dino noticed another gang working on a different hatch at the time. *See id.* at 61. Most of the longshore workers carrying out cargo operations were working from the dock or off "shoe boxes", platforms which pick the longshore workers up and lift them onto the containers. *Id.* at 31–32. Dino explained:

> Lately we do most of our working from the dock to the ship rather than being on the deck of the ship. We don't normally go onto the deck of the ship now, until the containers are cleared off the ship, then we go down below. Before we would be on the ship and handling cargo up there, but now because of safe-

ty reasons they have us working from the dock.

*Id.* at 30.

Upon reaching the hatch area his gang was working, Dino checked to see if the hatch cover was "undogged", or unlatched, to ensure that his gang did not lose additional time looking for a ship's mate to perform the function. *See id.* at 61. Dino noticed the hatch cover was undogged. *See id.* at 62. Dino then moved to the forward corner of the hatch and waited for his gang to unload the containers stacked on top of the hatch cover. *See id.* at 67. Dino estimated that he moved around the deck for approximately twenty minutes while his crew unloaded the containers resting on the hatch cover. *See id.* at 67–68. After removing the containers, the hatch cover would be removed using a Maher shore-side crane with a forty foot spreader bar. *See id.* at 70–71.

Dino testified that the gang "hooked up the inshore cover without incident and took it out." *Id.* at 72. Ruiz began having difficulty locking the spreader, the equipment used to remove the hatch covers, onto the second hatch cover in order to remove it from the hatch. *See id.* At 72–73. Aware of this difficulty, Dino ordered Trueba to ready the dumbbells, adapters used to lock the hatch cover, if Ruiz needed them. *See id.* at 73. To assist Ruiz with locking the spreader, Dino walked around the deck between the first and second hatch. *See id.* at 75. When Dino was halfway past the first hatch cover, Ruiz was able to lock the spreader and he began to raise the cover. *See id.* at 76. In response to this action, Dino testified that he "had to get out of the way." *Id.* To avoid contact with the hatch cover, Dino backed up quickly and testified he slipped on what he believed was ice. *See id.* at 81–82.[6] Dino fell back and was injured.

---

6.     Q. Now, you said that you—do you know what you slipped on, by the way?
A. No, I don't.
Q. So you don't know if you slipped on ice or oil or anything you—

    A. It was slippery enough. It was ice.
J. Dino Dep. at 81.

### 5. Dino's Contentions

Plaintiffs *argue* Defendants were negligent for turning over the ship to Maher while the deck "was laden with ice." *See* Opposition Brief at 1. Plaintiffs offer pictures of the deck, which show ice on the railings, hatch covers and ship equipment, and certifications of several members of Dino's gang stating that the deck was covered in ice. *See* Leonard Certification, Exhibit E (picture taken of the deck at noon on 18 January 1997); Leonard Certification, Exhibit C (Certification of Roberto Ruiz); Leonard Certification, Exhibit D (Certification of Manuel Trueba).

Plaintiffs *argue* that Farrell "knew the ship was not reasonably safe for cargo operations and that is why Farrell requested assistance from AMS to assist the ship's captain." Opposition Brief at 5–6. Plaintiffs *argue* that Farrell intended AMS would have two hours to remove ice and snow from the deck when Andrews called and ordered the crew on 17 January 1997. *See id.* at 3. Yet due to delays, Plaintiffs *argue* the crew was afforded only thirty minutes to perform the snow and ice removal services, before turning to their unlashing responsibilities. *See id.* at 5; Deck Log. Plaintiffs *argue* the time AMS had to clear the decks was insufficient and that Andrews and Stahl should not be believed concerning the condition of the deck. *See* Opposition Brief at 6, 11; *but see* Stahl Declaration ¶ 15.

Plaintiffs contend these arguments create genuine issues of material fact concerning whether Farrell acted reasonably, whether the thirty minutes of snow and ice removal was sufficient and whether the inspections were deficient. *See* Opposition Brief at 11. However, Plaintiffs do not offer or point to any evidence to support these arguments. Moreover, as noted, Plaintiffs failed to offer any expert testimony concerning the reasonableness of how or when Farrell acted or the duration of snow removal or the adequacy of the inspections.

Plaintiffs *argue* the salt the AMS crew placed on the deck was ineffective due to the cold weather. *See id.* Plaintiffs, however, offer no expert testimony for this proposition. Plaintiffs *argue* this presents another fact question—whether the salting itself demonstrated reasonable care to discharge Defendants' duty under Section 905(b). *See id.*

Plaintiffs *argue* Farrell violated the duty to warn the stevedore of latent defects, namely the ice on the decks of SS Argonaut. *See id.* at 12. Plaintiffs also *argue* Defendants knew or should have known that the longshore workers would confront the icy decks rather than avoiding the danger posed by the ice or ceasing stevedore operations. *See id.* Again, Plaintiffs fail to point to evidence, and fail to offer expert testimony, to establish this argument.

### Discussion

#### A. Summary Judgment Standard

To prevail on a motion for summary judgment, the moving party must establish "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The present task is to determine whether genuine issues of material fact exist and whether Farrell and AMS are entitled to judgment as a matter of law.

A District Court may not resolve factual disputes in a motion for summary judgment. *See Linan–Faye Constr. Co. v. Housing Auth.,* 49 F.3d 915, 926–27 (3d Cir.1995) ("[A]t the summary judgment stage, 'the judge's function is not ... to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.' ") (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)); *Desvi, Inc. v. Continental Ins. Co.,* 968 F.2d 307, 308 (3d Cir.1992) ("[T]hreshold inquiry is whether there are 'genuine factual issues that properly can be resolved only by a finder of

fact because they may reasonably be resolved in favor of either party' ") (citations omitted).

In considering a motion for summary judgment, all evidence submitted "must be viewed in the light most favorable to the nonmoving party and all inferences must be drawn in that party's favor." *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1077 (3d Cir.1992) (citing *Erie Telecommunications v. Erie*, 853 F.2d 1084, 1093 (3d Cir.1988)); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Kowalski v. L & F Products*, 82 F.3d 1283, 1288 (3d Cir.1996); *Meyer v. Riegel Products Corp.*, 720 F.2d 303, 307 & n. 2 (3d Cir.1983) (the court must resolve "all inferences, doubts and issues of credibility ... against the moving party"), *cert. dismissed*, 465 U.S. 1091, 104 S.Ct. 2144, 79 L.Ed.2d 910 (1984).

Although the summary judgment hurdle is difficult to overcome, it is not insurmountable. As Rule 56(e) makes clear, once the moving party files a properly supported motion, the burden shifts to the non-moving party to demonstrate the existence of a genuine issue of material fact. *See* Fed.R.Civ.P. 56(e); *see also Anderson*, 477 U.S. at 256, 106 S.Ct. 2505.

As the Supreme Court indicated in *Matsushita*, once the moving party has demonstrated the absence of a genuine issue of material fact, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." 475 U.S. at 586, 106 S.Ct. 1348. Indeed, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no "genuine issue for trial." *Matsushita*, 475 U.S. at 586–87, 106 S.Ct. 1348 (emphasis in original) (citations omitted). In other words, the inquiry involves determining " 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " *Brown v. Grabowski*, 922 F.2d 1097, 1111 (3d Cir.1990) (quoting *Anderson*, 477 U.S. at 251–52, 106 S.Ct. 2505) *cert. denied*, 501 U.S. 1218, 111 S.Ct. 2827, 115 L.Ed.2d 997 (1991).

"[T]he mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505; *Gomez v. Allegheny Health Serv., Inc.*, 71 F.3d 1079, 1085 (3d Cir.1995), *cert. denied*, 518 U.S. 1005, 116 S.Ct. 2524, 135 L.Ed.2d 1049 (1996); *see also Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1130–31 (3d Cir.1995); *United States v. 717 So. Woodward St.*, 2 F.3d 529, 533 (3d Cir. 1993) ("Although entitled to the benefit of all justifiable inferences from the evidence, the nonmoving party may not ... withstand summary judgment by resting on mere allegations or denials in the pleadings.") (citations omitted); *Players Int'l, Inc. v. United States*, 988 F.Supp. 497, 500 (D.N.J.1997) ("[T]he non-moving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial.") (citations omitted); *Nevets C.M., Inc. v. Nissho Iwai Am. Corp.*, 726 F.Supp. 525, 534 (D.N.J.1989), *aff'd without op'n*, 899 F.2d 1218 (3d Cir. 1990).

"The nonmoving party creates a genuine issue of material fact if [he or she] provides sufficient evidence to allow a reasonable jury to find for him [or her] at trial." *Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 326, 330 (3d Cir.1995) (citations omitted). If the nonmovant fails to make a sufficient showing regarding an essential element of his or her case upon which he or she will bear the ultimate burden of proof at trial, all other facts are necessarily immaterial and summary judgment must be granted. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 321, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Brewer*, 72

F.3d at 330; *Siegel,* 54 F.3d at 1130–31; *see also Armstrong v. City of Dallas,* 997 F.2d 62, 67 (5th Cir.1993) ("Summary judgment is appropriate where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant, or where it is so overwhelming that it mandates judgment in favor of the movant").

In *Anderson,* the Court held that "[i]f the evidence [submitted by the non-movant] is merely colorable, or is not significantly probative, summary judgment may be granted." 477 U.S. at 249–50, 106 S.Ct. 2505 (citations omitted). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248, 106 S.Ct. 2505; *see also Coolspring Stone Supply, Inc. v. American States Life Ins. Co.,* 10 F.3d 144, 148 (3d Cir.1993) (observing that for issue to be considered genuine, nonmoving party must adduce more than a mere scintilla of evidence in its favor). In addition, when the factual context renders a claim implausible, the nonmovant has a heavier burden of production in opposing a motion for summary judgment. *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348. "Summary judgment may present the district court with an opportunity to dispose of meritless cases and avoid wasteful trials." *Orson, Inc. v. Miramax Film Corp.,* 79 F.3d 1358, 1366 (3d Cir.1996) (citing *Celotex,* 477 U.S. at 327, 106 S.Ct. 2548).

Discovery in this case is completed. A review of all the submissions reveals no genuine factual dispute that can be described as "material" in light of the relevant case law. Accordingly, judgment may be awarded as a matter of law.

### B.   *Recovery Under the Act*

Plaintiffs bring this action against Farrell under Section 905(b) of the Act to recover damages for the physical injuries Dino suffered. Section 905(b) of the Act provides in pertinent part:

> In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person ... may bring an action against such vessel as a third party in accordance with the provisions of section 933 of this title, and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void. If such person was employed by the vessel to provide stevedoring services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing stevedoring services to the vessel.... The liability of the vessel under this subsection shall not be based upon the warranty of seaworthiness or a breach thereof at the time the injury occurred. The remedy provided in this subsection shall be exclusive of all other remedies against the vessel except remedies available under this chapter.

33 U.S.C. § 905(b).

The Act established a comprehensive workers' compensation program for longshoremen and their families. *See Serbin v. Bora Corp., Ltd.,* 96 F.3d 66, 70 (3d Cir.1996); *Davis v. Portline Transportes Maritime Internacional,* 16 F.3d 532, 548 (3d Cir.1994). The 1972 amendments to the Act increased the benefits payable to an injured longshoreman, abolished the longshoreman's strict liability cause of action against the vessel, and insulated the employer from third party liability to the vessel for the worker's injury. *See Howlett v. Birkdale Shipping,* 512 U.S. 92, 97, 114 S.Ct. 2057, 129 L.Ed.2d 78 (1994); *Scindia Steam Navigation Co. v. De Los Santos,* 451 U.S. 156, 165, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981).

The Act places primary responsibility for the safety of longshore workers on the shoulders of their employers, the stevedores. *See* 33 U.S.C. § 941 ("Section 941"). Section 941 requires the stevedore, as the longshore worker's employer, to provide a "reasonably safe" place to work and to take the safeguards necessary to

avoid injuries. *See id.* Congress altered the statutory responsibilities to reflect the belief that stevedores are in the best position to prevent injuries to longshore workers. *See Howlett,* 512 U.S. at 97, 114 S.Ct. 2057; *Scindia,* 451 U.S. at 165, 171, 101 S.Ct. 1614. The Act, as amended, grants an injured longshore worker primary recovery against his stevedore employer, and limits the liability that may be imposed against the vessel. *See* 33 U.S.C. § 905(b).

Section 905(b) of the Act provides longshoremen a cause of action for injuries resulting from the negligence of a ship or its crew. *See* 33 U.S.C. § 905(b); *see also Howlett,* 512 U.S. at 97, 114 S.Ct. 2057. The Act, however, does not specify what acts constitute negligence or what duties are owed by shipowners to longshore workers. *See* 33 U.S.C. § 905(b). Having determined that vessels are liable to longshore and harbor workers for negligence, Congress left it to the courts to define the contours of vessel negligence. *See Scindia,* 451 U.S. at 165–66, 101 S.Ct. 1614. "... Congress intended that the scope of a shipowner's liability would evolve under general common law principles." *Serbin,* 96 F.3d at 70 (citing H.R.Rep. No. 1441, 92d Cong., 2d Sess. (1972), reprinted in 1972 U.S.C.C.A.N. 4698, 4704).

In *Scindia,* the Court determined that a vessel may be liable for negligence under one of three duties imposed by Section 905(b). *See* 451 U.S. at 167, 101 S.Ct. 1614; *see also Howlett,* 512 U.S. at 98, 114 S.Ct. 2057; *Serbin,* 96 F.3d at 70; *Davis,* 16 F.3d at 537; *Kirsch v. Plovidba,* 971 F.2d 1026, 1028 (3d Cir.1992). These duties are the turnover duty or the duty to warn, the active operations duty and the duty to intervene. *See Howlett,* 512 U.S. at 98, 114 S.Ct. 2057; *Serbin,* 96 F.3d at 70; *Davis,* 16 F.3d at 537; *Kirsch,* 971 F.2d at 1028. The Court further observed that a shipowner's duties under the Act may be supplemented through custom, contract or existing laws. *See Scindia,* 451 U.S. at 172, 101 S.Ct. 1614.

The "turnover duty" applies at the time the vessel initially gives control of the ship to the stevedore. *See Howlett,* 512 U.S. at 98, 114 S.Ct. 2057. The "active operations/control duty" applies once the stevedoring operations have commenced. *See id.* This duty requires that a shipowner must exercise reasonable care to prevent injuries to longshoremen when it actively involves itself in cargo operations or when it actively controls the vessel. The "duty to intervene" concerns conduct after turnover "with regard to cargo operations in areas under the principal control of the independent stevedore." *Id.* The duty to intervene arises when a vessel knows of a hazard posed by defective equipment that the stevedore has continued to use and which poses "an unreasonable risk of harm to the longshoremen." *Scindia,* 451 U.S. at 175, 101 S.Ct. 1614.

Plaintiffs *argue* that Defendants, by failing to remove the ice from the deck, were negligent in failing to turn over the ship in a reasonably safe condition. *See* Opposition Brief at 2. In addition, Plaintiffs *argue* Defendants breached the turnover duty by failing to warn of the slippery condition on deck. *See id.* at 12. Finally, Plaintiffs *argue* Defendants breached the turnover duty because Farrell should have expected the stevedore could not or would not avoid the danger posed by the ice, but rather would confront the weather conditions. *See id.* Again, Plaintiffs have failed to offer or to point to evidence to support these arguments; there is no expert report or opinion from Plaintiffs to support any of these contentions.

### 1. *The Turn Over Duty*

■ The turnover duty imposes " 'both a duty to provide safe conditions and a corollary duty to warn of known, nonobvious hazards' " before the ship is turned over to the stevedore's control. *See Serbin,* 96 F.3d at 70 (quoting *Kirsch,* 971 F.2d at 1028); *see also Howlett,* 512 U.S. at 98, 114 S.Ct. 2057. The Court stated:

A vessel must **"exercise ordinary care** under the circumstances" to turn over the ship and its equipment and appliances "in such condition that **an expert and experienced stevedoring contractor,** mindful of the dangers he should reasonably expect to encounter, arising from the hazards of the ship's service or otherwise, will be able by the exercise of ordinary care" to carry on cargo operations "with reasonable safety to persons and property."

*Howlett,* 512 U.S. at 98, 114 S.Ct. 2057 (quoting *Federal Marine Terminals, Inc. v. Burnside Shipping Co.,* 394 U.S. 404, 89 S.Ct. 1144, 22 L.Ed.2d 371 (1969)) (emphasis added). Significantly, Plaintiffs have not proffered testimony or an opinion from an expert to establish in this case the precise contours of what "ordinary care" is, how Farrell failed to exercise such care, what an "expert and experienced stevedore contractor" would or would not do in the circumstances and how that would impact on the turnover duty of Farrell.

An owner of a vessel ordinarily "will not be liable to a longshore worker injured by an obvious hazard because the shipowner's duty is only to provide a workplace where skilled longshore workers can operate safely." *Id.; McCourt v. Mitsui O.S.K. Lines America, Inc.,* 921 F.Supp. 1315, 1318 (D.N.J.1996) (describing a deck opening without a ramp as an obvious danger). "As a general matter, the shipowner may rely on the stevedore to avoid exposing the longshoremen to unreasonable hazards." *Scindia,* 451 U.S. at 170, 101 S.Ct. 1614. This is based upon the fact that the Act holds the stevedore principally responsible for ensuring the safety of longshore workers. *See id.* at 170, 101 S.Ct. 1614; *see also* 33 U.S.C. § 941. Indeed, the ability to rely upon a expert stevedore implies that certain open and obvious hazards need not be remedied, provided an expert stevedore could safely work around them. *See Kirsch,* 971 F.2d at 1030 (citing *Bjaranson v. Botelho Shipping Corp., Manila,* 873 F.2d 1204, 1208 (9th Cir.1989)).

As explained, Plaintiffs have not provided an expert report or opinion that an expert stevedore could not or should not work around the snow and ice hazard presented in this case.

As mentioned, this Circuit has stated:

[A] shipowner can, ordinarily, reasonably rely on the stevedore (and its longshore employees) to notice obvious hazards and to take steps consistent with its expertise to avoid these hazards where practical to do so.... Thus, where a danger is obvious but easily avoidable, the shipowner will not be liable for negligence.

*Kirsch,* 971 F.2d at 1030. Plaintiffs have not demonstrated through expert testimony or otherwise that the hazard was not easily avoidable. While "in many cases the obviousness of a hazard under all circumstances, which includes as a key element the appreciability of the danger, will be a jury question," the Third Circuit has granted summary judgment when the evidence indicates a hazard was open and the shipowner was reasonable in relying upon the stevedore to eliminate the hazard. *Id.* at 1033.

In *Kirsch,* the shipowner turned over its vessel for loading with a large oil slick in the cargo hold. *See* 971 F.2d at 1027. Although the stevedore noticed the oil spill, no action was taken to clean, treat or otherwise remedy the spill. *See id.* During cargo operations, the plaintiff stepped in the oil. *See id.* The plaintiff later slipped as a result of the oil left on the bottoms of his shoes. *See id.* The Circuit affirmed the grant of summary judgment because the oil slick that caused the accident was obvious and known to the stevedore. *See id.* at 1034.

The Circuit determined that the shipowner was reasonable in assuming the stevedore would remedy the oil spill. *See id.* at 1033. Specifically, the Circuit commented that the existence of an Occupational Safety and Hazard Administration ("OSHA") regulation requiring the stevedore to remedy slippery conditions, as they

occur, suggests the shipowner was reasonable in relying upon the stevedore to remedy the oil spill. *See id.* Further, the Circuit commented that sawdust was available to treat the oil spill and that the plaintiff did not allege that it would be impractical for the stevedore to treat the oil spill before commencing cargo operations. *See id.* In addition, the Circuit found that the plaintiff offered no evidence indicating that the shipowner was aware the stevedore and longshore workers would confront the hazard rather than avoiding it or remedying it. *See id.* at 1034. This case is no different.

■ In certain circumstances, however, a shipowner cannot reasonably rely on longshore workers to avoid obvious hazards. *See Kirsch,* 971 F.2d at 1030. When a hazard is obvious yet practically unavoidable, the shipowner cannot rely upon the stevedore or the longshore worker to avoid the hazard. *See id.* This entails a consideration of whether "under all the circumstances, safer alternatives were impractical." *Id.* (citing *Morris v. Compagnie Maritime Des Chargeurs Reunis, S.A.,* 832 F.2d 67, 71 (5th Cir. 1987)) (noting a plaintiff need not show there was no safer alternatives, but rather, that under the circumstances safer alternatives were unduly impractical). The Plaintiffs have not shown through the production of expert testimony, or otherwise, safer alternatives were impractical or unavailable.

■ A shipowner may be negligent in not eliminating the hazard, if a shipowner would reasonably be aware that a stevedore and the longshore workers would not avoid an obvious hazard, but would instead confront the hazard. *See id.* at 1030–31; *Scindia,* 451 U.S. at 174–175, 101 S.Ct. 1614 ("mere knowledge of the danger [is] not sufficient in itself to fasten such a duty on the shipowner, but if the shipowner should anticipate that the stevedore will not or cannot correct the danger *and that the longshoremen cannot avoid it,* then the shipowner's duty is triggered to take steps

... to eliminate the hazard." (emphasis added)). This may be shown through custom, contract or other laws supplementing a shipowner's duties under the Act. *See Scindia,* 451 U.S. at 172, 176, 101 S.Ct. 1614. Thus, "a shipowner may be negligent for failing to eliminate an obvious hazard that it could have eliminated, but only when it should have expected that an expert stevedore could not or would not avoid the hazard and conduct cargo operations reasonably safely." *Kirsch,* 971 F.2d at 1031. This is not the case presented by Plaintiffs through expert opinion or otherwise.

In *Howlett,* the Court considered the contours of the duty to warn of latent defects. *See* 512 U.S. at 99, 114 S.Ct. 2057. The Court specifically observed that the duty to warn must be considered in light of the stevedore's statutory duty to ensure the safety of longshore workers. *See id.* Further, the Court stated the duty to warn attaches only to "hazards that would be neither obvious to nor anticipated by a competent stevedore in the ordinary course of cargo operations." *Id.* In so holding, the Court rejected imposing upon a shipowner the duty to inspect the cargo area before turnover. *See id.* at 104, 114 S.Ct. 2057. Further, when hazards are obvious there can be no recovery under Section 905(b) for a shipowner's failure to warn. *See id.*

### 2. Application of the Turnover Duty in the Instant Case

■ In order to prevail on the Motion for Summary Judgment, Defendants must establish no genuine issues of material fact exist concerning whether Defendants acted reasonably when they turned over the ship to Maher. Plaintiffs *argue* genuine issues of material fact exist concerning whether Farrell acted reasonably by turning over the SS Argonaut with ice on the deck, whether the thirty minutes of snow and ice removal was sufficient and whether the alleged inspections were deficient. *See* Opposition Brief at 11. Further,

Plaintiffs *argue* the effectiveness of the salting due to the cold weather and the adequacy of salting as a method of eliminating the hazard also raise fact questions. *See id.* Plaintiffs also *argue* that there are genuine issues of material fact concerning Farrell's turnover duty to warn of latent defects. *See id.* at 12. Indeed, Plaintiffs *argue* whether the snow and ice constituted a latent defect is a genuine issue of material fact which precludes summary judgment. *See id.* at 16–17. Finally, Plaintiffs *argue* whether Farrell knew the longshore workers could not or would not avoid the danger posed by the icy deck prevents summary judgment. *See id.* at 12. As explained, Plaintiffs have not offered expert testimony, or other evidence, to support *any* of these arguments.

As the Circuit explained in *Kirsch,* the significant distinction separating the turnover duty from the duty to intervene is that the turnover duty is concerned with the conduct before cargo operations commence while the duty to intervene covers conduct following turnover. *See* 971 F.2d at 1029. This case concerns allegations of an injury which occurred during cargo operations, after the ship had been turned over to the stevedore. At that stage, the owner of the vessel had no continuing duty to inspect, or indeed supervise cargo operations conducted by the stevedore following turnover. *See id.* Because the turnover duty requires the owner of the ship to tender it in a condition such that an expert stevedore acting with reasonable care could conduct cargo operations safely, the requirement to warn of a hidden hazard is significant. However, in this case because Dino conceded the ice conditions were obvious, the duty to warn of such "hidden hazard" is not relevant. *See id.*

The *Kirsch* court adopted the observation made by the Ninth Circuit that

> the fact that cargo operations will be conducted by an "expert and experienced" stevedore "implies that certain dangers that may be hazardous to unskilled persons need not be remedied if

an expert and experienced stevedore could safely work around them."

971 F.2d at 1029–1030 (quoting *Bjaranson v. Botelho Shipping Corp., Manila,* 873 F.2d 1204, 1208 (9th Cir.1989)). This is the rationale why an owner of a vessel can ordinarily rely on a stevedore and its employees to both note obvious hazards and to take steps to avoid them. *See id.* at 1030.

The *Kirsch* opinion and its teachings are particularly instructive. *Kirsch* restated the principle that "where a danger is obvious but easily avoidable, the shipowner will not be liable for negligence." *Id.* Significantly, *Kirsch* stated:

> [I]f in this case we could assume that the oil slick were obvious to a reasonably prudent stevedore and its longshore workers but small enough to be avoided easily by skirting it, we would conclude that the stevedoring operations could be conducted safely, and hence that the shipowner was not negligent in failing to provide a safe workplace.

*Id.*

The instant case presents a situation similar to that presented in *Kirsch.* SS Argonaut alerted Andrews, Farrell's Port Manager, before its arrival of the snow and ice conditions. Farrell retained AMS to perform snow and ice removal. Andrews also alerted the stevedore, Maher, to the conditions of the vessel. Upon the arrival, and before cargo operations began, AMS began snow and ice removal. Although cold weather operations are common and it is common for a vessel to arrive with accumulations of snow and ice, the Ship Superintendent, Stahl, testified that before turnover he inspected the cargo operations area (and indeed the whole ship) and found the vessel to be free from snow and ice.

Dino testified he noticed and was aware of the snow and ice, that he did not warn his gang to take precautions, that he did not take precautions, that he did not speak with Maher's safety man who was on duty

and that the presence of ice did not constitute a reason to call the safety man.

Drawing all inferences in favor of Plaintiffs, it will be assumed the ice was pervasive and covered the area where Dino was injured. In fact, the snow and ice were obvious and it appears the stevedore, and its employees, were thoroughly aware of its presence. These expert and experienced longshore workers are skilled workers and could be expected to work around the conditions of the day. This much is clear from the testimony of Dino who said he did not call the safety man or advise his gang to take precautions or himself take precautions because the presence of the snow and ice did not constitute a reason to do so.

Dino, like Kirsch, candidly admitted the conditions were obvious and he was aware of them before he entered on the vessel. *See Kirsch*, 971 F.2d at 1033. Like Kirsch, Dino appreciated the conditions. *See id.* The Circuit in *Kirsch* assumed the oil slick was so large that Kirsch and others could not have avoided the oil in the area in question. Kirsch argued that alone sufficed to defeat summary judgment. The Circuit disagreed. The Circuit stated the stevedore and the longshore workers had another option—eliminate the obvious hazard by treating or cleaning up the oil slick themselves or by telling the ship's crew to clean it up. *See id.* Likewise, here it will be assumed the snow and ice were pervasive and could not be avoided. Nevertheless, Dino had the same options as Kirsch. Salt was available, the AMS workers were available and the stevedore's safety man was available.

In *Kirsch,* the Circuit referenced OSHA regulations which indicated stevedores are "competent to treat oil spills, a typical form of slippery condition during cargo operations." *Id.* The presence of snow and ice during cold weather operations is typical and snow and ice are typical forms of slippery conditions during cold weather operations. Stevedores are as competent to treat slippery snow and ice conditions, as they are to treat oil spills.

Although Defendants have established it is common during cold weather for vessels to arrive with an accumulation of ice and snow, it is known in the stevedoring industry in general, and at Maher in particular, that if snow and ice render working conditions unsafe, the longshore workers should stop work, Dino has not established otherwise. There is nothing in the submissions which suggests the longshore workers would have continued cargo operations despite the presence of snow and ice, if such rendered the area unsafe.

As the *Kirsch* decision instructs:

[A] shipowner can, ordinarily, reasonably rely on the stevedore (and its longshore employees) to notice obvious hazards and to take steps consistent with its expertise to avoid those hazards where practical to do so.

*Id.* at 1030.

Defendants had a duty to turnover SS Argonaut

"in such condition that an expert and experienced stevedoring contractor, mindful of the dangers he should reasonably expect to encounter, arising from the hazards of the ship's service or otherwise, will be able by the exercise of ordinary care to carry on cargo operations with reasonable safety to persons and property."

*Howlett,* 512 U.S. at 98, 114 S.Ct. 2057 (quoting *Federal Marine Terminals, Inc. v. Burnside Shipping Co.,* 394 U.S. 404, 89 S.Ct. 1144, 22 L.Ed.2d 371 (1969)). Defendants were entitled to rely upon Maher to ensure the safety of the longshore workers.

Plaintiffs' own testimony concerning the use of shoe boxes to work around unsafe conditions on deck indicates that Maher, as an expert stevedore, could, and indeed did, work around the icy deck conditions. *See* J. Dino Dep. at 30. In fact, Dino testified that due to OSHA regulations longshore workers rarely worked from the ships'

decks due to safety concerns. *See id.* In light of the Circuit's analysis in *Kirsch*, Defendants were reasonable in relying upon Maher to comply with OSHA regulations. *See Kirsch*, 971 F.2d at 1033 (noting that the existence of an OSHA regulation requiring the stevedore to remedy slippery conditions *as they occur* indicates a shipowner acts in a reasonable manner when relying upon the stevedore to comply with the OSHA regulation).

Plaintiffs have not raised a genuine issue of material fact; the ice on the ship was open and obvious, and significantly, Dino was aware of it. *See Howlett*, 512 U.S. at 98, 114 S.Ct. 2057; *Kirsch*, 971 F.2d at 1030. Plaintiffs rely upon *Bellomo v. United Arab Shipping*, 863 F.Supp. 107 (S.D.N.Y.1994), *arguing* that ice by its very nature poses a latent condition. *See* Opposition Brief at 16. In *Bellomo*, a longshoreman slipped and fell during cargo operations on ice that was underneath snow on a vessel's deck. *See Bellomo*, 863 F.Supp. at 108. The court concluded that whether the ice was on the deck at the time of turnover presented a genuine issue of material fact precluding summary judgment. *See id.* at 111.

Further, the court noted that whether the ice was a latent condition presented a question of fact which prevented the entry of summary judgment. *See id.* In so holding, *Bellomo* relied upon the plaintiff's testimony that he could not see the ice under the snow. *See id.* In contrast, Dino, a longshore worker for more than thirty years, admitted in his testimony that he was aware of the ice and did not deem the ice to be the kind of a safety hazard he would warn his gang about or that would cause him to take precautions or notify the safety officer on duty for Maher. *See* J. Dino Dep. at 50–53.

Plaintiffs have not established a case under the turnover duty. *See Howlett*, 512 U.S. at 99, 114 S.Ct. 2057 (requiring shipowners to warn stevedores of latent conditions). Plaintiffs *argue* that no warning signs were posted on the ship indicating that the decks were icy. *See* J. Dino Dep. at 50. The record is clear, however, that the ice was not a hidden condition. *See id.* at 50–53. Further, Farrell warned Maher about the ice on the deck. *See* Andrews Dep. at 116; Stahl Declaration ¶ 12. Accordingly, Defendants could expect that Maher, the stevedore, would fulfill its statutory obligations under Section 941 by passing along the warnings to the longshore workers or remedying the hazard. *See Howlett*, 512 U.S. at 99, 114 S.Ct. 2057.

The general statement by Trueba, *see* Trueba Certification ¶ 5, that longshore workers work through all weather conditions, including ice, does not create genuine issues of material fact about the Defendants' knowledge that the longshore workers would confront the ice rather than avoiding it. *See Kirsch*, 971 F.2d at 1034. The statement in no way suggests that Defendants knew or should have known that the stevedore would ignore the statutory duty to keep longshore workers safe imposed by Section 941 and would begin cargo operations despite the existence of a safety hazard that could not be avoided during operations. In fact, Dino's testimony regarding the use of shoe boxes suggests that Defendants were reasonable in relying upon Maher to protect the longshore workers from unsafe deck conditions. *See* J. Dino Dep. at 30. In addition, testimony from Stahl indicates that the stevedore was aware of the risks posed by ice and accordingly he conducted an inspection of the decks before commencing stevedore operations. *See* Stahl Declaration ¶ 15. It is this testimony which supports Defendants' position that they relied upon the stevedore to perform its statutory duty under Section 941 to ensure the safety of the longshore workers and that the Defendants believed that the stevedore would remedy any safety hazards before the start of cargo operations. *See Kirsch*, 971 F.2d at 1034. Because the asserted danger was obvious but easily avoidable, the Defendants are not liable for negligence. *See id.* at 1030. Afford-

ing Plaintiffs all reasonable inferences, no genuine issue of material fact exists. Accordingly, the Motion for Summary Judgment is granted.

*Conclusion*

For the reasons stated, the Motion for Summary Judgment is granted.