Robert P. BJARANSON,
Plaintiff–Appellee,

v.

BOTELHO SHIPPING CORPORATION,
MANILA, Defendant–Appellant.

No. 86–4168.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 5, 1988.

Memorandum Filed Nov. 16, 1988.

Decided March 10, 1989.

Raymond J. Conboy, Robert K. Udziela, Pozzi, Wilson, Atchison, O'Leary & Conboy, Portland, Or., for plaintiff-appellee.

Paul N. Wonacott and Craig C. Murphy, Wood Tatum Mosser Brooke & Landis, Portland, Or., for defendant-appellant.

Before HALL and O'SCANNLAIN, Circuit Judges, and KELLER,* District Judge.

KELLER, District Judge:

The district court entered judgment against Botelho Shipping Corporation, which now appeals. We reverse and remand with instructions that judgment be entered in favor of the defendant.

## PROCEEDINGS AND FACTS

The plaintiff, Bjaranson, sued the Botelho Shipping Corporation ("Botelho") for injuries he sustained while unloading cargo aboard a vessel. His theory of liability was based upon negligence, and the action was brought pursuant to § 5(b) of the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 905(b) (1982).

A jury returned a verdict in his favor. Thereafter, Botelho moved for judgment notwithstanding the verdict and for a new trial. Both motions were denied by the district court. Botelho now appeals the denial of those motions.

Bjaranson, a longshoreman with nineteen years experience, was hired to unload cargo from the M/V STAR MINDANAO while it was docked at Astoria, Oregon. The

vessel arrived early in the morning on January 28, 1984. By 8:00 a.m. the stevedore company, Bjaranson's employer, had commenced the cargo operation aboard the vessel.

The vessel had seven hatches that were numbered consecutively starting at the bow of the vessel; the hatch closest to the bow was the No. 1 hatch. The No. 1 hatch and the No. 3 hatch were the foci of the cargo operation, which involved unloading wood pulp from those two hatches.

Bjaranson did not work on the ship during the day; he was a member of the night shift, which started at 6:00 p.m. He and two other longshoremen arrived at the ship around 5:45 p.m. When they boarded the vessel, the night was misting and foggy, and the vessel was dark, except for the lights at the No. 1 hatch where they were to work. The gangway was at midship, and after boarding, the men walked forward toward the No. 1 hatch along the dockside passageway between the ship's rail and the hatch coamings.[1] Their destination was an access ladder leading into the No. 1 hatch. This ladder was accessible from a small escape hatch located on the deck between the No. 1 and No. 2 hatches.

The passageway traveled by the men was blocked at the bow end of the No. 2 hatch by the leg of a Munck-loader crane. This crane straddled the hatch, and it was equipped with a boom. In order to straddle the hatches, the forward and aft cranes were mounted on high metal legs which ran on tracks the full length of the vessel's deck. The tracks lay in the passageway between the rail and the hatch coamings.

Rather than squeezing past the crane leg, the plaintiff and the other men climbed the outer side of the crane leg in order to reach the top of the No. 2 hatch cover and proceed forward. There was evidence that the men were accompanied on the hatch top by their supervisor, a stevedore walking

---

* The Honorable William D. Keller, District Judge, Central District of California, sitting by designation.

1. A coaming is the raised perimeter of a hatch. On the M/V STAR MINDANAO the coamings rose to a level of approximately eight feet above the deck.

boss/foreman. Once atop the hatch cover, the men searched for a way down. In order to get off the hatch, which was unlighted, Bjaranson attempted to descend a "coaming ladder" on the bow side of the No. 2 hatch. He testified that the area about the ladder was "pitch dark ... [t]here [was] no light at all." He apparently sought a hand hold but "there was nothing to hold onto," and he fell to the deck.

At trial, several witnesses testified that the ladder was unsafe because there were no handholds and the ladder terminated two or three feet below the top of the hatch. The defendant introduced evidence that the ladder was identical in design to at least ten other coaming ladders on the ship, and that these particular ladders were only designed for observation into the hold; they were not designed to provide access to the hatch tops.

Immediately after the fall, the men remaining on the hatch did not use the coaming ladder to climb down to the deck below. At least one of the men used the crane itself to reach the deck to assist Bjaranson. Thereafter, during the remainder of the cargo operation, the workmen visually signalled to the crane operator, or called to him to move the crane whenever they desired a clear passage. It was established at the trial and acknowledged at oral argument that the crane was operated by longshoremen.

Bjaranson sued Botelho, the bare boat charterer, for negligence under 33 U.S.C. § 905(b). Bjaranson claimed that Botelho was negligent in failing to provide a coaming ladder with a handhold or handrails, and in failing to provide a safe means of access to the No. 1 hatch.

The jury determined that each party was negligent, and concluded that Bjaranson's comparative negligence was forty-five percent.

## DISCUSSION

First, Bjaranson challenges Botelho's right to appeal the denial of the motion for judgment *non obstante verdicto*. Specifically, Bjaranson asserts that Botelho failed to move for a directed verdict at the close of all the evidence, a prerequisite for appealing a denial of a motion for judgment n.o.v. *See Freimanis v. Sea–Land Service, Inc.,* 654 F.2d 1155, 1161 (5th Cir. 1981).

██ At the close of the plaintiff's evidence, Botelho made a motion for directed verdict, but the district court declined to rule on the motion at that time. Later, at the close of its case, Botelho orally requested the court to consider its earlier motion. The request was acknowledged by the judge, but he did not rule on the motion. In these circumstances, the oral renewal of the motion was sufficient to satisfy the requirement that a motion for directed verdict be made at the close of all the evidence. *See Bachtel v. Mammoth Bulk Carriers, Ltd.,* 605 F.2d 438, 441–42 (9th Cir.1979) (sufficient to request instruction requiring the jury to return verdict in defendant's favor), *cert. granted and judgment vacated on other grounds,* 451 U.S. 978, 101 S.Ct. 2301, 68 L.Ed.2d 835 (1981); *Quinn v. Southwest Wood Prods., Inc.,* 597 F.2d 1018, 1025 (5th Cir.1979) (adopting liberal view of what constitutes a motion for directed verdict); *United States Indus., Inc. v. Semco Mfg., Inc.,* 562 F.2d 1061, 1065 (8th Cir.) (oral motion sufficient), *cert. denied,* 434 U.S. 986, 98 S.Ct. 613, 54 L.Ed.2d 480 (1977).[2] Therefore, Botelho has preserved the right to appeal the denial of its motion for judgment n.o.v.

In reviewing the denial of that motion, this Court applies the same standard as

---

**2.** There also exists authority supporting the view that there was no need to renew the motion. When the district judge declined to rule on the motion at the close of the plaintiff's case, he said, "[m]y inclination on this is to rule on this [motion] post-trial, submit the matter to the jury. If you disagree with the verdict, whatever it is, you can move on those grounds." This statement could well have been understood by defendant's counsel as meaning "not merely that renewal of the motion at the close of the evidence would not be necessary but that it would not be entertained." *Ebker v. Tan Jay Int'l Ltd.,* 739 F.2d 812, 823 (2d Cir.1984). In such a case, a "renewal of the motion is not necessary to preserve the moving party's rights." *Farley Transp. Co. v. Santa Fe Trail Transp. Co.,* 786 F.2d 1342, 1346–47 (9th Cir.1985).

that applied by the trial court. *Walker v. KFC Corp.,* 728 F.2d 1215, 1223 (9th Cir. 1984). "[T]he correct test is whether or not, viewing the evidence as a whole, 'there is substantial evidence present that could support a finding, by reasonable jurors, for the nonmoving party.'" *Quichocho v. Kelvinator Corp.,* 546 F.2d 812, 813 (9th Cir. 1976) (quoting *Chisholm Bros. Farm Equip. Co. v. International Harvester Co.,* 498 F.2d 1137, 1140 (9th Cir.), *cert. denied,* 419 U.S. 1023, 95 S.Ct. 500, 42 L.Ed.2d 298 (1974)).

In applying this standard of review, the evidence must be reviewed in light of the duty of care owed by Botelho to Bjaranson. The applicable duty of care was set forth in *Scindia Steam Navigation Co. v. De Los Santos,* 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981).[3] There are five distinct aspects of that duty.

First, the vessel must "[exercise] ordinary care under the circumstances to have the ship and its equipment in such condition that an expert and experienced stevedore will be able by the exercise of reasonable care to carry on its cargo operations with reasonable safety to persons and property." *Id.* at 167, 101 S.Ct. at 1622. This may be described as the turnover duty of safe condition, as it relates to the condition of the vessel before it is turned over to the stevedore.

Second, the vessel must

[warn] the stevedore of any hazards on the ship or with respect to its equipment that are known to the vessel or should be known to it in the exercise of reasonable care, that would likely be encountered by the stevedore in the course of his cargo operations and that are not known by the stevedore and would not be obvious to or anticipated by him if reasonably competent in the performance of his work.

*Id.* This may be described as the turnover duty to warn.

Thirdly, the vessel may be liable "if it actively involves itself in the cargo opera-tions and negligently injures a longshore-man." *Id.* This may be described as the active involvement duty. And a related fourth duty is that the vessel may be liable "if it fails to exercise due care to avoid exposing longshoremen to harm from hazards they may encounter in areas, or from equipment, under the active control of the vessel during the stevedoring operation." *Id.* This may be described as the active control duty.

Finally, the Court held that a vessel is at times under a duty to intervene in the stevedore's operations and correct a dangerous condition. This duty arises when 1) the vessel is aware of the condition, 2) the vessel should realize the condition presents an unreasonable risk of harm to the long-shoremen, and 3) the vessel knows that the stevedore, as a result of an "obviously improvident" judgment, has failed to remedy the situation. *Id.* at 175–76, 101 S.Ct. at 1626. Specifically, the Court stated that

it is quite possible, it seems to us, that [the stevedore's] judgment in this respect was so obviously improvident that [the shipowner], if it knew of the defect and that [the stevedore] was continuing to use it, should have realized the winch presented an unreasonable risk of harm to the longshoremen, and that in such circumstances it had a duty to intervene and repair the ship's winch.

*Id.* (footnote omitted). This may be described as the intervention duty. *See Taylor v. Moram Agencies,* 739 F.2d 1384, 1387–88 (9th Cir.1984).

At trial the jury received instructions on the two turnover duties and the intervention duty. Having considered the arguments of the parties, this Court concludes that none of these duties was breached in this case.

■ With respect to the turnover duty of safe condition, the Supreme Court in *Scindia* did not state unequivocally that the ship and its equipment must be in a safe condition. Rather, in preparing the ship

---

**3.** The standard of care under § 905(b) described in *Scindia* applies to "true owners or other parties with similar dominion over the boat." *Kerr–McGee Corp. v. Ma–Ju Marine Services, Inc.,* 830 F.2d 1332, 1340 n. 8 (5th Cir.1987). This includes bare boat charterers, such as Botelho. *Id.* at 1342–43.

for a cargo operation, the vessel must exercise ordinary care in light of the fact that the operation will be conducted by an "expert and experienced" stevedore. This implies that certain dangers that may be hazardous to unskilled persons need not be remedied if an expert and experienced stevedore could safely work around them.

This conclusion is supported by the more complete statement of the first turnover duty as set forth in *Federal Marine Terminals, Inc. v. Burnside Shipping Co.*, 394 U.S. 404, 89 S.Ct. 1144, 22 L.Ed.2d 371 (1969), the case cited in *Scindia*. There it is stated that the ship must be "in such condition that an expert and experienced stevedoring contractor, *mindful of the dangers he should reasonably expect to encounter*, arising from the hazards of the ship's service or otherwise," will be able to conduct the cargo operation with safety. *Federal Marine Terminals*, 394 U.S. at 416 n. 18, 89 S.Ct. at 1151 n. 18 (emphasis added).[4] The explicit reference to dangers remaining aboard ship indicates that a shipowner may leave unremedied conditions that would otherwise be considered unreasonably dangerous to less skilled persons.[5]

■ This Court recognizes that a reasonable juror could, arguably, find the ladder to be a "hazard." However, such a general conclusion does not in and of itself end the analysis. More is required, namely, the plaintiff must introduce evidence that the hazard was such that an expert and experienced stevedore would not "be able by the exercise of reasonable care to carry on its

cargo operations with reasonable safety to persons and property." *Scindia*, 451 U.S. at 167, 101 S.Ct. at 1622. It is this additional showing that is absent in this case. The burden of proving actionable negligence under the *Scindia* standard was upon Bjaranson. *Doucet v. Diamond M Drilling Co.*, 683 F.2d 886, 892 (5th Cir. 1982), *cert. denied*, 459 U.S. 1227, 103 S.Ct. 1234, 75 L.Ed.2d 468 (1983). Rather than establishing negligence under that standard, the evidence in this case supports the conclusion that an expert and experienced stevedore could have safely conducted the cargo operation. The crane could have been moved by simply making a verbal or visual contact with the crane operator. Or, if the operator had been warned not to move the crane, the men, according to the testimony, could have squeezed around the leg of the crane. Furthermore, the crane itself provided an alternative means of descent from the hatch top. From this evidence it is apparent that all that was required to eliminate in its entirety any arguable hazard was movement of the crane. Such circumstances cannot give rise to a breach of the duty of safe condition.

■ Nor does the record support a finding that Botelho breached the turnover duty to warn or the duty to intervene. The duty to warn limits the ship's ability to rely on the stevedore to cope with hazards existing on board; the ship may rely on the stevedore to work around such hazards only if they are obvious or capable of being anticipated by a stevedore reasonably competent in the performance of his work. If

---

**4.** The complete statement of the turnover duty of safe condition is as follows:

"the shipowner owes the stevedoring contractor at least the following obligations:

'(1) to exercise ordinary care under the circumstances to place the ship on which the stevedoring work is to be done, and the equipment and appliances aboard ship, in such condition that an expert and experienced stevedoring contractor, mindful of the dangers he should reasonably expect to encounter, arising from the hazards of the ship's service or otherwise, will be able by the exercise of ordinary care under the circumstances to load or discharge the cargo, as the case may be, in a workmanlike manner and with reasonable safety to persons and property.'"

*Federal Marine Terminals*, 394 U.S. at 416 n. 18, 89 S.Ct. at 1151 n. 18 (quoting *Hugev v. Dampsk-*

*isaktieselskabet Int'l*, 170 F.Supp. 601, 610–11 (S.D.Cal.1959), *aff'd sub nom., Metropolitan Stevedore Co. v. Dampskisaktieselskabet Int'l*, 274 F.2d 875 (9th Cir.), *cert. denied*, 363 U.S. 803, 80 S.Ct. 1237, 4 L.Ed.2d 1147 (1960)).

**5.** In addition, the district judge, whose articulation of the duty was adopted verbatim by the Supreme Court, expressly stated that "the stevedoring contractor cannot reasonably expect, and does not expect, to board a vessel which in all respects, as to equipment and appliances as well as hull, is in a seaworthy condition, or even in a reasonably safe condition." *Hugev*, 170 F.Supp. at 610. It is reasonable to conclude that the Supreme Court, in adopting the formulation of the district court in *Hugev*, must have considered with approval the concomitant interpretation of that duty by the district court.

they are hidden, and the vessel is deemed to be aware of them, the vessel may not rely on the stevedore unless the stevedore has been warned. Furthermore, if the stevedore fails to work around such hazards, despite their obvious nature or a warning by the vessel, and the vessel learns of this failure, the vessel may be subject to the duty to intervene.[6]

▮ In this case, there was no evidence that the ladder, or any "hazard" associated with it, was not obvious.[7] Indeed, there was never a suggestion that the claimed lack of safety could, in any sense, be described as "hidden." Moreover, the record lacks any evidence that Botelho knew how the longshoremen were conducting the cargo operation. Without that evidence, there can be no support for a finding that Botelho knew that the stevedore company had failed to remedy the asserted dangerous condition, a prerequisite to triggering the duty to intervene. For these reasons there has been a failure to establish a breach of either the duty to warn or the duty to intervene.

▮ The trial court held that the remaining duties, the active control duty and the active involvement duty, were not applicable to the case, and they were not the subject of instruction below. The inapplicability of the active involvement duty has not been disputed. Bjaranson, however, argues on appeal that there was sufficient evidence to support a finding of liability under the active control duty.

Since the cargo operation involved only the No. 1 and No. 3 hatches, Bjaranson argues that Botelho retained control over the No. 2 hatch and the area around the coaming ladder. This, without more, is insufficient to establish the requisite control as contemplated by *Scindia*, which would require that the area be under the "active" control of the defendant. The record lacks any evidence that Botelho retained and exercised active control over the area in question. *See Davis v. Partenreederei M.S. Normannia*, 657 F.2d 1048, 1052 (9th Cir. 1981) (evidence was introduced that the vessel maintained control over gangway).

On the other hand, there was evidence that the longshoremen placed the lid of the No. 1 hatch on top of the cover of the No. 2 hatch during the cargo operation. This is the only evidence pertaining to the issue of control, and it disproves the theory that Botelho retained active control over the area of the No. 2 hatch. This theory thus has no support in the record, and consequently this Court is required to render judgment n.o.v. *Cf. Weade v. Dichmann, Wright & Pugh, Inc.*, 337 U.S. 801, 808–09, 69 S.Ct. 1326, 1330, 93 L.Ed. 1704 (1949) (appellate court should not order judgment n.o.v. if there is a suggestion of an alternative theory of liability not passed on by the jury); *Neely v. Martin K. Eby Constr. Co.*, 386 U.S. 317, 325, 87 S.Ct. 1072, 1078, 18 L.Ed.2d 75 (1967).

In light of the insufficiency of the evidence, the judgment must be reversed.

---

6. The duty to intervene is not limited to hazards which develop after the commencement of the cargo operation. After setting forth the intervention duty, the Court in *Scindia* stated that "[t]he same would be true if the defect existed from the outset and [the vessel] must be deemed to have been aware of its condition." *Scindia*, 451 U.S. at 176, 101 S.Ct. at 1626; *cf. Ollestad v. Greenville S.S. Corp.*, 738 F.2d 1049, 1051–52 (9th Cir.1984) (declining to resolve this question), *cert. dismissed*, 469 U.S. 1197, 105 S.Ct. 982, 83 L.Ed.2d 984 (1985).

7. The condition of the ladder was apparent and obvious when Bjaranson's employer, the stevedoring contractor, boarded the ship and assumed the control of the cargo operation. Although the condition may not have been obvious to Bjaranson at night, the fact that the condition was obvious to his employer eliminat-

ed whatever duty there may have been upon Botelho to warn the individual employees. *See generally, Gulf Oil Corp. v. Bivins*, 276 F.2d 753, 758 (5th Cir.) (applying Restatement of Torts § 343 (1934)), *cert. denied*, 364 U.S. 835, 81 S.Ct. 70, 5 L.Ed.2d 61 (1960).

Indeed, to conclude otherwise would result in the "creation of a shipowner's duty to oversee the stevedore's activity and insure the safety of longshoremen [that] would ... saddle the shipowner with precisely the sort of nondelegable duty that Congress sought to eliminate by amending section 905(b)." *Hurst v. Triad Shipping Co.*, 554 F.2d 1237, 1250 n. 35 (3d Cir.), *cert. denied*, 434 U.S. 861, 98 S.Ct. 188, 54 L.Ed.2d 134 (1977); see *also Scindia*, 451 U.S. at 169–70, 101 S.Ct. at 1623–24 (describing "the rightful expectation of the vessel that the stevedore would perform his task properly without supervision by the ship").

Therefore, this Court need not address the merits of Botelho's motion for a new trial.

This case is REVERSED and REMANDED, with instructions that judgment be entered in favor of the defendant.