[No. A127424. First Dist., Div. Four. Mar. 16, 2011.]

ALAN BARTHOLOMEW, Plaintiff and Appellant, v.
SEARIVER MARITIME, INC., Defendants and Respondents.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part II.A. and B.

COUNSEL

Brayton ◆ Purcell, Alan R. Brayton, Lloyd F. LeRoy and Richard M. Grant for Plaintiff and Appellant.

Armstrong & Associates, William H. Armstrong and Jennifer D. Fitzpatrick for Defendants and Respondents.

OPINION

**SEPULVEDA, J.**—This appeal arises from the asbestos-related injuries sustained by plaintiff Alan Bartholomew, a ship repair worker employed by

West Winds, Inc. (West Winds), while working on various ships owned by defendant SeaRiver Maritime, Inc. (SeaRiver). Bartholomew brought suit against SeaRiver as a vessel owner under the Longshore and Harbor Workers' Compensation Act (33 U.S.C. § 901 et seq.; LHWCA or Act). SeaRiver moved for summary judgment, which the trial court granted. Finding no triable issue of material fact that SeaRiver breached a duty owed to Bartholomew, we affirm.

I.

FACTUAL AND PROCEDURAL BACKGROUND

Between 1977 and 1980, Bartholomew worked as a marine machinist at West Winds, a ship repair company located in San Francisco. During his employment, he worked on the maintenance and repair of numerous ships owned by SeaRiver. In particular, he performed repair work on pumps, valves, turbines, compressors, and other equipment on the ships. The areas in which Bartholomew worked on the ships—engine rooms, boiler rooms, and machinery spaces—contained numerous pipes covered with insulation. Bartholomew was diagnosed with asbestosis in or about October 2006. He contends that his condition results from exposure to asbestos-containing products while working aboard SeaRiver's vessels, as well as from airborne asbestos fibers on those ships.

On April 4, 2007, Bartholomew filed a complaint seeking damages for his asbestos exposure against numerous defendants, including SeaRiver. He claimed that SeaRiver was liable for vessel owner negligence under the LHWCA.

At the time of Bartholomew's deposition, which was taken on April 10, 2008, he was unable to name a single SeaRiver (or Exxon)[1] vessel where he performed work. He testified that although he had known the names of the Exxon vessels that he had worked on while employed by West Winds, he could not recall the specific names "at [that] time." He was able to recall, however, that he had worked on "around ten" Exxon vessels while at West Winds.

Subsequently, in response to written discovery propounded by SeaRiver, Bartholomew reiterated that he was unable to name a specific SeaRiver vessel. Then, in October 2008, as part of his supplemental interrogatory responses, Bartholomew identified the Exxon Hawaii and the Exxon Valdez

---

[1] SeaRiver was known as Exxon Shipping Company from 1982 to 1993 and as the Marine Department of Exxon Company, U.S.A., from 1973 to 1982.

as ships on which he worked. Bartholomew also "reserve[d] the right to amend [his] response, should [he] at a later point recall further what ships he worked on."

Following subsequent discovery, in which no additional SeaRiver vessels were identified by Bartholomew, SeaRiver moved for summary judgment on the grounds that (1) SeaRiver did not own or operate a vessel called Exxon Hawaii, and thus it could not be liable for anything that occurred on that vessel; (2) Bartholomew could not have been aboard the Exxon Valdez from 1977 to 1980 because she had not yet been constructed, and, in any event, was asbestos free in her subsequent construction; and (3) Bartholomew could not obtain evidence of any breach of duty under the LHWCA, as articulated in *Scindia Steam Navigation Co. v. De Los Santos* (1981) 451 U.S. 156 [68 L.Ed.2d 1, 101 S.Ct. 1614] (*Scindia*), which provides that a vessel owner's duty encompasses elimination of an unsafe condition or warning of such condition only insofar as necessary to render the work safe for "expert and experienced" (boldface & underscoring omitted) contractors (in the case of actual harmful conditions) and contractors of "reasonabl[e] competence" (in the case of latent hazards). (*Scindia, supra*, 451 U.S. at pp. 166–167.)

SeaRiver's separate statement of facts referred to, among other things, the legal presumption that a ship repair contractor is both an expert and experienced, and as such the shipowner is entitled to rely on the contractor's judgment in deciding whether an obvious hazard can be negotiated in a safe manner. (See *Howlett v. Birkdale Shipping Co.* (1994) 512 U.S. 92, 105 [129 L.Ed.2d 78, 114 S.Ct. 2057] (*Howlett*); *Randolph v. Laeisz* (5th Cir. 1990) 896 F.2d 964, 971, citing *Scindia, supra*, 451 U.S. at pp. 175–176.) Additionally, SeaRiver referred to the fact that since 1971 shipyard employers have been required by the Occupational Safety and Health Act of 1970 (29 U.S.C. § 651 et seq.; OSHA) to know about the potential hazards of asbestos and to protect their workers accordingly. (See 36 Fed.Reg. 10466 (May 29, 1971); Civ. Code, § 3548.)

SeaRiver's separate statement referred to a declaration submitted by John Tompkins, current president of Tompkins Marine Services and former SeaRiver employee. Tompkins worked as the acting fleet operations manager for several SeaRiver vessels from 1976 to 1985, and as an operations representative for new ship design and construction from 1982 to 1985; Tompkins held a number of different positions at SeaRiver from 1985 to 2000. In his declaration, Tompkins averred that at all times relevant to Bartholomew's claims, "it was SeaRiver's custom and practice to turn over vessels in a safe condition, with the understanding that an experienced and skilled shipyard contractor and personnel could anticipate hazards associated with products or materials commonly present aboard vessels, including

asbestos. It was well-known in the maritime industry, in the 1970's, that asbestos-containing thermal insulation and other materials were sometimes present aboard vessels. It was not necessary to inform any shipyard contractor, which was in the business of installing thermal insulation and other materials aboard vessels, that asbestos might be present or that preventative measures might be necessary to prevent asbestos exposure since they were the repair experts. In [his] experience, the shipyards, by no later than the late 1970's, were aware of asbestos and the regulations regarding asbestos. When SeaRiver turned over its vessels to shipyards, it did so with the understanding that the shipyard contractors would anticipate the presence of asbestos and could work around it safely, using recommended [safety] precautions. . . ."

SeaRiver's separate statement also referred to several declarations submitted by a different plaintiff in another asbestos case against SeaRiver, which were entirely consistent with Tompkins's declaration that use of asbestos on merchant ships was a commonly known fact. For example, in his declaration, well-known "asbestos consultant" Charles Ay opined that, based on his background, training, and experience, "asbestos-containing materials, including pipecovering insulation, were installed on oil tanker ships constructed prior to 1974." Ay further explained that he based his opinion, in part, on his experience as an insulator on Navy cargo and other ships that were similar to SeaRiver's ships.

Similarly, industrial hygienist Kenneth Cohen opined in his declaration that "[p]ipecovering insulation used on steam and hot water pipes on oil tankers contained asbestos through at least the early 1970s."

Additionally, according to Richard Cohen, M.D., a " 'state of the art' " expert, "the need for safety precautions, including use of worker respiratory protection to prevent asbestos-related diseases was well described in literature prior to 1949. . . ." Dr. Cohen referred to a report generated by the chief safety inspector for Standard Oil Company of New Jersey, which discussed "the health hazards associated with occupational exposure to asbestos, and the need for safety precautions to protect workers from asbestos dust, including the use of masks, respirators and wet-down procedures to prevent asbestos-related disease." (Bonsib, Roy A., Dust Producing Operations in the Production of Petroleum Products and Associated Activities (July 1937).) Dr. Cohen also referenced an article in which the author opined that "breathing of dust under the following conditions is seriously harmful: . . . [¶] . . . [¶] Asbestos and every operation in which it is used." (Willson, Frederick, M.D., *The Very Least an Employer Should Know about Dust and Fume Diseases* (Nov. 1931) Safety Engineering, p. 318.) Based on this information and his expertise and experience regarding the historical state of the art of the hazards of asbestos exposure, Dr. Cohen opined that "by at least

1937" the "health hazards associated with occupational exposure to asbestos" were known, and the "specific methods and steps to prevent asbestos-related injuries to exposed workers" were also known.

In opposition, Bartholomew did not contest the motion as to the Exxon Hawaii or the Exxon Valdez. Rather, he claimed a refreshed recollection of working on two different ships, the Exxon Baton Rouge and the Exxon Galveston. In support of his opposition, Bartholomew submitted four declarations.

In the first declaration, Bartholomew himself averred that although initially he could not recall the specific names of the Exxon oil tankers on which he performed overhaul and repair work, since his deposition his attorneys had provided him with "vessel status" cards regarding the Exxon oil tankers that "refreshed" his recollection after reviewing them. Bartholomew recalled working on the Exxon Baton Rouge and the Exxon Galveston while employed at West Winds between 1977 and 1980. He stated that he worked in various locations on these ships, including the engine rooms, boiler rooms, and machinery spaces. Prior to performing any work in these areas, Bartholomew explained that he would conduct a "pre-overhaul 'walk through,'" during which he saw "numerous valves, pumps, and pipes, including steam pipes." He observed that the "pipes were covered with insulation" that was an "off-white . . . color," with a "chalky texture." He said he also recalled that the "pipecovering looked old," explaining that some of it was "cracked or torn," and some "had holes in it." He averred that he observed the "deteriorated pipecovering" before any "disturbance or removal of the pipecovering by insulators or other trades." Bartholomew stated that during his work on the Exxon Baton Rouge and the Exxon Galveston, which included removal of the "old and deteriorated pipecovering insulation," he worked in "close proximity to various trades, including insulators, machinists, welders, electricians, riggers, and laborers." He recalled that these trades "also disturbed and removed pipecovering insulation," which "created large amounts of visible dust from the pipecovering" in his presence. He averred that he was "exposed to this dust."

A second opposing declaration was that of "asbestos consultant" Charles Ay, who had worked for approximately 20 years as an insulator at Long Beach Naval Shipyard. Ay stated that as a shipyard insulator during the 1960's and 1970's, he "removed and installed asbestos-containing pipecovering and block insulation, cements and cloth materials on steamlines and other equipment in the engine rooms and boiler rooms of ships." Ay averred that, based on his work at the shipyard, he was "familiar with the various trades that work on ships, and their duties, including marine machinists" and was well familiar with the "construction of oil tanker ships, and the use of

pipecovering . . . and other insulation materials on these ships." Based on his training and experience, he opined that "asbestos-containing materials, including pipecovering insulation, were installed on oil tanker ships constructed prior to 1974." He gave the opinion that, given the completion date of the Exxon Baton Rouge and the Exxon Galveston in 1970, "asbestos-containing materials, including pipecovering insulation, were used in the construction" of these ships.

Ay further stated that he had reviewed Bartholomew's declaration. Given this information and based upon his experience as a shipyard insulator, he opined that "pipecovering insulation materials in the engine rooms, boiler rooms, and machinery spaces" in the Exxon Baton Rouge and the Exxon Galveston "were shedding asbestos fibers and dust in these compartments between the initial operation of the ships, and the late 1970s . . . simply due to the routine operation of the ships." Ay further stated that this "asbestos contamination" was present in the Exxon Baton Rouge and the Exxon Galveston "prior to the vessels being turned over to West Winds, and prior to any pre-overhaul inspection work" by Bartholomew from 1977 to 1980. Based on this information, Ay opined that Bartholomew was exposed to asbestos "during the performance of his pre-overhaul inspection work on the ships, which occurred prior to any disturbance or removal of the insulation by insulators or other trades."

Bartholomew's third opposing declaration was that of industrial hygienist Kenneth Cohen, who averred he had been "often called upon to evaluate toxic exposures (including asbestos)." He stated he had "extensive experience consulting on workplace exposure levels and abatement procedures . . . including on board ships," and that he had "conducted research" on numerous asbestos-containing products, "including pipecovering and block insulation," and that he had "studied how asbestos is released into the air from these products, and how it behaves in the air once released." Cohen averred that he had tested " 'mothballed' " vessels and found "airborne asbestos" levels presenting a "significant hazard" to individuals on the vessel, which he opined "would have been higher" during general operation or repair work.

Cohen further stated that "numerous reports in the scientific literature of asbestos air sampling from ships, including sampling on . . . repair and maintenance activities" indicated that asbestos fibers once released "continue to contaminate the area of initial release, and will migrate away from the source, thereby contaminating remote areas." Cohen discussed the concept of "re-entrainment," a term used to describe the "continuous movement of asbestos fiber from a settled state on surfaces to an airborne state." He referred to a number of specific studies in support of this concept of resuspension of settled fibers, adding that "[v]arious writings, textbooks and

publications on industrial hygiene and asbestos dust exposure dating as early as 1930, have discussed the properties of asbestos dust and the concept of re-entrainment."

Cohen stated he had reviewed the above mentioned declarations of Bartholomew and Ay. Given this information, and his experience and expertise, he opined that Bartholomew "was exposed to hazardous levels of respirable asbestos fiber and dust while working on board" the Exxon Baton Rouge and the Exxon Galveston "during his pre-overhaul inspection work on these ships between . . . 1977–1980 [while] at West Winds." He offered his opinion that loose asbestos fibers and dust, which would have been generated by the initial insulation and by any subsequent disturbance or removal of that insulation would have remained in the "engine rooms, boiler rooms and machinery spaces of the ships for a long period of time, absent stringent abatement procedures," and this "asbestos contamination" created an "unsafe condition which was present prior to, and at the time" Bartholomew boarded the ships. Given this information, Cohen was of the opinion that Bartholomew was exposed to a "hazardous and unsafe level of asbestos during his pre-overhaul work, which occurred prior to the disturbance or removal of pipecovering by insulators and other trades during overhaul and repair work."

Bartholomew's final opposing declaration was that of " 'state of the art' " expert Dr. Cohen who stated that "[a] review of the historic medical and scientific literature shows that as early as the 1930s" it was known that "the breathing of asbestos dust in the workplace was harmful and dangerous to worker health." As in the declaration submitted by SeaRiver in support of summary judgment, in this declaration Dr. Cohen referred to the same 1937 report, discussing "the health hazards associated with occupational exposure to asbestos, and the need for safety precautions to protect workers from asbestos dust, including the use of masks, respirators and wet-down procedures to prevent asbestos-related disease." Dr. Cohen also referenced the 1931 article in which the author opined that "breathing of dust under the following conditions is seriously harmful: . . . [¶] . . . [¶] Asbestos and every operation in which it is used." (Willson, Frederick, M.D., *The Very Least an Employer Should Know about Dust and Fume Diseases, supra,* Safety Engineering, at p. 318.) Given this information and his expertise and experience regarding the historical state of the art of the hazards of asbestos exposure, Dr. Cohen opined that, "by at least 1937," the "health hazards associated with occupational exposure to asbestos," were known as well as "specific methods and steps to prevent asbestos-related injuries to exposed workers."

Bartholomew's argument in opposition to SeaRiver's motion was that his opposing declarations were sufficient to raise a triable issue of material fact

as to whether SeaRiver breached its duty to " 'turn over' " the Exxon Baton Rouge and the Exxon Galveston to West Winds in a "safe condition" prior to his working on the vessels at West Winds between 1977 and 1980.

In its reply papers, SeaRiver claimed that Bartholomew's declaration, identifying the Exxon Baton Rouge and the Exxon Galveston, purported to impeach his prior deposition testimony and/or interrogatory responses, which did not reference the names of these vessels. SeaRiver argued the court should give Bartholomew's deposition testimony more credibility and disregard the contradictory statements in his subsequent declaration. SeaRiver further argued that even if the court considered Bartholomew's declaration, this evidence failed to raise any triable issues of fact because it did not rebut the presumption that West Winds, as Bartholomew's employer, complied with OSHA regulations dealing with asbestos and was, therefore, aware of asbestos hazards aboard vessels by 1977.

SeaRiver reasserted that Bartholomew's supporting declarations by Ay, Kenneth Cohen, and Dr. Cohen were consistent with the presumption that West Winds was presumed to be an expert and charged with the knowledge of what was known and knowable of asbestos hazards. SeaRiver additionally objected to the declarations of Ay and Kenneth Cohen. Its position was that neither Ay nor Cohen had demonstrated any personal knowledge regarding the composition of the insulation material aboard the SeaRiver vessels, and hence no foundation had been laid to demonstrate that the Exxon Baton Rouge and the Exxon Galveston actually contained asbestos.

Following a hearing on April 10, 2009, the trial court granted SeaRiver's motion for summary judgment. In granting the motion, the court struck the portions of Bartholomew's declaration stating that he had worked aboard the Exxon Baton Rouge and the Exxon Galveston, on the ground that these statements constituted an improper impeachment of Bartholomew's previous interrogatory responses. Substantively, the court's order, in effect, accepted SeaRiver's argument that there were no triable issues of fact because West Winds was presumed to be an expert and experienced ship repair contractor.

The ensuing judgment in SeaRiver's favor was filed on November 2, 2009. The instant appeal followed.

## II.

## DISCUSSION

### A., B.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### C. *Duties of Vessel Owner*

#### 1. *Statutory Scheme*

■ The LHWCA establishes a comprehensive workers' compensation program that provides benefits to persons engaged in maritime employment, including longshore and ship repair workers.[2] (33 U.S.C. §§ 902(3), 905(b); *Thomas v. Newton Internat. Enterprises* (9th Cir. 1994) 42 F.3d 1266, 1268 (*Thomas*); *Cook v. Exxon Shipping Co.* (9th Cir. 1985) 762 F.2d 750, 752.) Prior to 1972, an injured repair worker could receive compensation from his employer as well as damages from the vessel owner. (*Martinez v. Korea Shipping Corp., Ltd.* (1990) 903 F.2d 606, 609.) If the unsafe condition rendered the vessel unseaworthy, the vessel owner was strictly liable for the injuries without any evidence of fault. (*Ibid.*, citing *Seas Shipping Co. v. Sieracki* (1946) 328 U.S. 85, 90 [90 L.Ed. 1099, 66 S.Ct. 872].) The 1972 amendments to the LHWCA abolished the unseaworthiness cause of action, leaving only a statutory negligence cause of action. (*Martinez v. Korea Shipping Corp., Ltd., supra,* 903 F.3d at p. 609.)

■ Under the existing Act, a maritime worker's employer is shielded from liability beyond payment of statutory benefits. (*Thomas, supra,* 42 F.3d at p. 1268.) "Under certain limited circumstances, the . . . worker may seek damages in a statutory negligence action from the owner of the vessel on which he was injured . . . . [Citation.]" (*Ibid.*, citing 33 U.S.C. § 905(b) (hereafter section 905(b)); see *Howlett, supra,* 512 U.S. at p. 98.)[3]

■ In *Scindia, supra,* 451 U.S. 156, the United States Supreme Court articulated the limited circumstances in which a vessel owner may be liable

---

*See footnote, *ante,* page 699.

[2] Longshore workers—persons who load and unload ships—are typically employed by stevedores. (See, e.g., *Scindia, supra,* 451 U.S. at pp. 158, 170, fn. 18; Black's Law Dict. (9th ed. 2009) p. 1027, col. 2.)

[3] Section 905(b) provides, in pertinent part, as follows: "In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person . . . may bring an action against such vessel as a third party . . . and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void. . . . The liability of the vessel under this subsection shall not be based upon the warranty of seaworthiness or a breach thereof at the time the injury occurred. . . ."

under section 905(b). (*Scindia*, at pp. 166–167.) The Court explained that vessel owners have three primary duties under section 905(b), which "consistently have been described as the 'turnover duty,' dealing with the condition of the ship when the owner turns it over to shoreside workers; the 'active control' duty, dealing with the owner's liability if it actively involves itself in activities taking place after turnover or controls equipment used at that time; and the 'intervention' duty, dealing with the owner's supervisory role after turnover. [Citation.]" (*Buck v. ACandS, Inc.* (2007) 211 Ore.App. 324 [154 P.3d 750, 755] (*Buck*), citing *Howlett, supra*, 512 U.S. at p. 98.)

### 2. *Turnover Duties*

 The present case involves only the "turnover" duty. *Scindia* described that duty as having dual aspects: the turnover duty of safe condition, and its corollary, the turnover duty to warn. "This duty extends at least to exercising ordinary care under the circumstances to have the ship and its equipment in such condition that an *expert and experienced stevedore* will be able by the exercise of reasonable care to carry on its cargo operations with reasonable safety to persons and property, and to warning the stevedore of any hazards on the ship or with respect to its equipment that are known to the vessel or should be known to it in the exercise of reasonable care, that would likely be encountered by the stevedore in the course of his cargo operations and that are not known by the stevedore and would not be obvious to or anticipated by him if reasonably competent in the performance of his work. [Citation.] The shipowner thus has a duty with respect to the condition of the ship's gear, equipment, tools, and work space to be used in the stevedoring operations; and if he fails at least to warn the stevedore of hidden danger which would have been known to him in the exercise of reasonable care, he has breached his duty and is liable if his negligence causes injury to a longshoreman." (*Scindia, supra*, 451 U.S. at pp. 166–167, italics added; accord, *Howlett*, 512 U.S. at p. 98.) Although *Scindia* and *Howlett* "deal with stevedore companies and not repair companies, the standards are the same." (*Buck, supra*, 154 P.3d at p. 755; see *Hill v. Texaco, Inc.* (5th Cir. 1982) 674 F.2d 447, 451 ["The rationale of *Scindia* is not limited to stevedoring operations. It clearly applies to any independent contractor and its harborworker employees covered by the LHWCA and working aboard ship."].) Indeed, section 905(b) by its terms applies equally to providers of "stevedoring services" and "repairing" services.

Bartholomew argues that the record discloses a genuine issue of material fact regarding whether SeaRiver breached its turnover duties, because, at the time of turnover, certain ships were contaminated with deteriorating asbestos-containing pipe insulation and airborne asbestos fibers. He contends that the trial court "failed to properly distinguish" between its ruling that his employer, West Winds, should be presumed " 'an expert and experienced' "

contractor, and its duty to analyze the "relevant factors" identified in *Scindia* and *Howlett*, which he claims constituted "questions of fact" for a jury.

According to Bartholomew, the "correct and relevant questions . . . are not whether West Winds was an 'expert and experienced' repair yard, or whether SeaRiver is entitled to rely" on this presumption. Rather, Bartholomew asserts that the "requisite questions of fact" are as follows: "1) Was the presence of asbestos fibers a latent and hidden danger? [¶] 2) Was the deteriorating condition of the asbestos-containing pipe insulation a latent and hidden danger prior to the 'walk-through' by plaintiff? [¶] 3) Should West Winds have anticipated the deteriorating insulation was asbestos-containing, even though all ships did not have asbestos-containing pipe insulation? [¶] 4) What did an experienced shipyard know about the dangers of asbestos in 1977? (A question that cannot be decided as a matter of law.) [¶] 5) Did SeaRiver have a duty to warn West Winds that its ships had deteriorating asbestos-containing insulation prior to plaintiff being exposed to invisible asbestos fibers? [¶] 6) Was the presence of invisible and ambient asbestos fibers an unreasonably dangerous condition even to an experienced shipyard?"

■ As we shall explain below, Bartholomew has failed to raise a triable issue concerning whether asbestos-containing insulation and airborne asbestos is (or is not) a danger that an "expert and experienced" ship repair contractor would have reasonably been expected to encounter during the relevant period. Summary judgment was therefore properly granted in favor of SeaRiver with respect to the turnover duty of safe condition and its corollary, the duty to warn.

### a. *Turnover Duty of Safe Condition*

■ One of the primary duties of a vessel owner is to turn over the vessel to the shoreside employer in a reasonably safe condition. (See *Scindia, supra*, 451 U.S. at p. 167; *Thomas, supra*, 42 F.3d at p. 1269.) With respect to this duty, the Supreme Court in *Scindia* did not unequivocally state that a vessel owner is required to turn over a vessel free from *all* hazards. (See *Bjaranson v. Botelho Shipping Corp., Manila* (9th Cir. 1989) 873 F.2d 1204, 1207 (*Bjaranson*); *Thomas, supra*, at p. 1269.) Rather, the vessel must be free of hazards that prevent an " 'expert and experienced' " maritime contractor from carrying on his operation in a reasonably safe manner. (*Bjaranson, supra*, at pp. 1207–1208; see *Thomas, supra*, at p. 1269.) "This implies that certain dangers that may be hazardous to unskilled persons need not be remedied if an expert and experienced [maritime contractor] could safely work around them. [¶] . . . [T]he ship must be 'in such condition that an expert and experienced . . . contractor *mindful of the dangers he should reasonably*

*expect to encounter*, arising from the hazards of the ship's service or otherwise,' will be able to conduct the . . . operation with safety. [Citation.] The explicit reference to dangers remaining aboard ship indicates that a shipowner may leave unremedied conditions that would otherwise be considered unreasonably dangerous to less skilled persons." (*Bjaranson, supra,* 873 F.2d at p. 1208, original italics & fn. omitted, citing *Marine Terminals v. Shipping Co.* (1969) 394 U.S. 404, 416, fn. 18 [22 L.Ed.2d 371, 89 S.Ct. 1144].)

In other words, any "obvious" hazard must not "present[] an unreasonably dangerous work environment to experienced [contractors] exercising reasonable care." (*Martinez v. Korea Shipping Corp., Ltd., supra,* 903 F.2d at p. 610.) While recognizing that reasonableness is ordinarily a factual inquiry (*id.* at p. 609), this general conclusion does not in and of itself end the analysis. (See *Bjaranson, supra,* 873 F.2d at p. 1208.) Thus, Bartholomew's list of purported "requisite" fact questions notwithstanding, more is required. (*Ibid.*) Namely, Bartholomew was required to introduce evidence raising a triable issue of material fact that the presence of asbestos-containing pipe insulation and airborne asbestos fibers aboard the SeaRiver vessels were such that an "expert and experienced" contractor would not "be able by the exercise of reasonable care to carry on its cargo operations with reasonable safety to persons and property." (*Scindia, supra,* 451 U.S. at p. 167; see *Bjaranson, supra,* at p. 1208.)

Bartholomew asserts that the "law requires more than just presuming that there is an expert and experienced repair yard." (Boldface omitted.) We have no quarrel with the notion that what a stevedore or repair yard knew or should have known under the circumstances often involves questions of fact. However, contrary to Bartholomew's assertion, the "correct and relevant" question *is* whether West Winds, as an expert and experienced ship repair contractor, would reasonably expect asbestos-containing products and/or airborne asbestos fibers to be aboard the types of vessels that it serviced. (*Scindia, supra,* 451 U.S. at p. 167; *Howlett, supra,* 512 U.S. at p. 98.) The cases cited by Bartholomew do nothing to challenge this well-established presumption. (See, e.g., *Manuel v. Cameron Offshore Boats, Inc.* (5th Cir. 1997) 103 F.3d 31, 33 [negligence and causation are findings of fact; existence of duty is question of law]; *Keller v. U.S.* (1st Cir. 1994) 38 F.3d 16, 33–34 [judgment affirmed where expert and experienced stevedore could have avoided ladder hazard].)

█ Once SeaRiver moved for summary judgment on a record devoid of evidence establishing a genuine issue of material fact regarding whether an expert contractor would not have reasonably expected to encounter asbestos aboard the vessels to be repaired, the burden of producing evidence on this

issue fell to Bartholomew. (Code Civ. Proc., § 437c (p)(2); *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 [107 Cal.Rptr.2d 841, 24 P.3d 493].) However, Bartholomew did not present *any* evidence that would meet this burden. Rather, he asserted that SeaRiver was not entitled to rely on the presumption of an expert and experienced contractor because SeaRiver produced no evidence that West Winds had any knowledge of asbestos hazards aboard the vessels it serviced. This argument not only improperly shifts the burden onto SeaRiver, but also it is contrary to the 1972 LHWCA amendments, which were implemented to shift the responsibility for compensating injured contractors from the vessel owner to the employer, who is " 'in a far better position' " to avoid the injuries that a contractor might suffer in the course of providing his services. (*Scindia, supra,* 451 U.S. at p. 171.) Indeed, the 1972 amendments "rejected the notion of a nondelegable duty on the shipowner to provide a safe place to work and did not undermine the justifiable expectations of the vessel that the [contractor] would perform with reasonable competence and see to the safety" of those performing the work. (*Scindia,* at p. 172.)

As noted by *Scindia, supra,* 451 U.S. at page 170, 33 United States Code section 941, part of the LHWCA, requires a shoreside employer "to provide a 'reasonably safe' place to work and to take such safeguards with respect to equipment and working conditions as the Secretary of Labor may determine to be necessary to avoid injury to longshoremen." Consistent with these obligations, the Secretary of Labor has published specific and detailed "Safety and Health Regulations for Longshoring" governing respiratory protection that are applicable to employers. (See 29 C.F.R. § 1910.134 (1971).) Since 1971, shipyard employers have been required by OSHA to know about the potential hazards of asbestos and to protect their workers accordingly. (See 36 Fed.Reg. 10466 (May 29, 1971); Civ. Code, § 3548.) Indeed, Bartholomew's own evidence indicates as early as the 1930's it was known that "the breathing of asbestos dust in the workplace was harmful and dangerous to worker health." One of Bartholomew's experts even referenced the 1937 report (Bonsib, Roy A., Dust Producing Operations in the Production of Petroleum Products and Associated Activities), discussing "the health hazards associated with occupational exposure to asbestos, and the need for safety precautions to protect workers from asbestos dust, including the use of masks, respirators and wet-down procedures to prevent asbestos-related disease." This evidence supports the legal conclusion that in 1977, asbestos-containing products and/or airborne asbestos fibers were types of dangers that " 'an expert and experienced . . . contractor' " would " 'reasonably expect to encounter, arising from the hazards of the ship's service or otherwise.' " (*Howlett, supra,* 512 U.S. at p. 98.)

The cases Bartholomew relies on for the general proposition that negligence in maritime cases is a question of fact do not compel a contrary

conclusion. For example, in *Thomas, supra*, 42 F.3d 1266, the court reversed summary judgment in favor of the vessel owner finding a material issue of fact regarding the "unreasonabl[e] danger[]" of an " 'unguarded, uncovered deck opening or manhole positioned within two feet of the bottom of an access ladder. . . .' " (*Id.* at p. 1269.) Similarly, in *Martinez v. Korea Shipping Corp., Ltd., supra*, 903 F.2d 606, the court reversed summary judgment in favor of the vessel owner reasoning that whether an unguarded ladder opening on a lashing platform was unreasonably dangerous constituted a question of fact. (*Id.* at p. 609.) Also, in *Scheuring v. Traylor Brothers, Inc.* (9th Cir. 2007) 476 F.3d 781, the court, in reversing summary judgment in favor of the vessel owner, concluded there was a genuine issue of material fact as to whether the owner's ramp-float-skiff means of access to the vessel was unreasonably dangerous. (*Id.* at pp. 788, 790–791.)

These cases, and the others cited by Bartholomew, involve situations in which reasonable fact finders may differ on whether a particular hazard creates an unreasonably dangerous work environment. (See e.g., *Cook v. Exxon Shipping Co., supra*, 762 F.2d at pp. 750, 753 [summary judgment reversed where triable issues of fact existed as to whether owner failed to warn of hidden bunker fuel tank and whether owner actively involved itself in repair operations]; *O'Hara v. Weeks Marine, Inc.* (2d Cir. 2002) 294 F.3d 55, 65–67 [summary judgment reversed, "[d]espite . . . scant evidence," where fact issues existed regarding whether general contractor breached its duty to intervene and its active control duty]; *Moore v. M.P. Howlett, Inc.* (2d Cir. 1983) 704 F.2d 39, 42 [shipowner not relieved of liability as a matter of law because relied on stevedore's judgment to proceed with work in spite of dangerous condition].)

Here, rather than establishing a triable issue of material fact as to whether asbestos-containing pipe insulation and/or airborne asbestos fibers constituted an "unreasonably dangerous" hazard, the evidence supports the conclusion that by 1977, an expert and experienced ship repair contractor should have reasonably expected to encounter asbestos aboard the vessels it repaired, and, as a consequence, should have been mindful of the dangers of asbestos exposure, taking the necessary and required safety precautions. Accordingly, the mere presence of the alleged asbestos-containing products and airborne asbestos fibers, standing alone, cannot constitute a breach of the turnover duty of safe condition.

Although not cited by either party, *Buck, supra*, 154 P.3d 750, a recent appellate decision from Oregon, addressed a similar issue and affirmed summary judgment in favor of various vessel owners, including SeaRiver. There, repair workers failed to present evidence that the presence of asbestos was not known by the contractors and would not be obvious or reasonably

anticipated by the contractors if reasonably competent in the performance of their work. (*Id.* at pp. 757–758.) In so ruling, the court noted that the plaintiffs' own evidence indicated that use of asbestos in ships was apparent in the industry, which supported the legal conclusion that asbestos is the type of danger an expert and experienced contractor would reasonably expect to encounter arising from the ship's service. (*Id.* at p. 758, fn. 6.)

Bartholomew, like the plaintiffs in *Buck, supra,* 154 P.3d 750, has not pointed to any evidence in the record or legal authority that would support the conclusion that asbestos is not the type of hazard that an expert and experienced ship repair contractor should reasonably expect to encounter. (*Id.* at p. 757, fn. 6.) In the absence of a triable issue on this factual issue that is a prerequisite to establishing SeaRiver's turnover duty of safe condition, the trial court did not err in granting summary judgment.

#### b. *Turnover Duty to Warn of Latent Hazards*

Bartholomew also argues that triable issues of material fact exist regarding whether SeaRiver had a duty to warn West Winds that its ships had asbestos-containing insulation prior to his exposure to airborne asbestos fibers during his preoverhaul walk through.

As articulated in *Howlett, supra,* 512 U.S. at page 105, a "vessel's turnover duty to warn . . . is a narrow one. The duty attaches only to latent hazards, defined as hazards that are not known" to the contractors and that "would be neither obvious to nor *anticipated* by a skilled" contractor in the "competent performance of its work." (Italics added.) The duty to warn "encompasses only those hazards that 'are known to the vessel or should be known to it in the exercise of reasonable care.' [Citation.]" (*Ibid.*)

Thus, in order to withstand summary judgment on the turnover duty to warn, Bartholomew must show the existence of an issue of material fact that there was a latent hazard on the ships at the time of turnover and that (1) SeaRiver knew or should have known of the defect, (2) the defect would likely be encountered in the course of the servicing work, and (3) the defect *was not known or reasonably anticipated* by West Winds. (*Howlett, supra,* 512 U.S. at p. 105; *Buck, supra,* 154 P.3d at p. 755.)

Again, Bartholomew's own evidence, indicating that the use of asbestos on ships and its health risks was known as early as the 1930's, establishes that it was *not unreasonable* for West Winds to *anticipate* the presence of asbestos on the ships that it serviced. Accordingly, the record discloses no evidence of any latent hazard for which a warning would have been required. The trial court properly granted summary judgment in favor of SeaRiver.

## III.

## DISPOSITION

The judgment is affirmed. Respondent is entitled to its costs on appeal.

Ruvolo, P. J., and Rivera, J., concurred.